(87–CV–257) Cheryl MARTIN, by her Guardian ad Litem, Paul J. Scoptur, Robert Martin and Darlene Martin, Plaintiffs-Appellants-Petitioners,

v.

William H. RICHARDS, M.D., Defendant and Third-Party Plaintiff-Respondent Cross Petitioner,

WISCONSIN HEALTH CARE LIABILITY INSURANCE PLAN, Defendant-Respondent,

WISCONSIN PATIENTS COMPENSATION FUND, Defendant-Respondent Cross-Petitioner,†

AETNA LIFE & CASUALTY COMPANY and Wisconsin Department of Health & Social Services, Defendants-Appellants,

v.

WISCONSIN HEALTH CARE LIABILITY INSURANCE PLAN, Third-Party Defendant-Respondent.

(88–CV–465) Cheryl MARTIN, by her Guardian ad Litem, Paul J. Scoptur, Robert Martin and Darlene Martin, Plaintiffs-Appellants-Petitioners,

v.

Mark HANSEN, M.D., Defendant-Respondent-Cross Petitioner,

FORT ATKINSON MEMORIAL HOSPITAL, Wisconsin Health Care Liability Insurance Plan, Defendants-Respondents,

---

†Motion for Reconsideration denied June 20, 1995.

156

WISCONSIN PATIENTS COMPENSATION FUND, Defendant-Respondent Cross-Petitioner,

AETNA LIFE & CASUALTY COMPANY and Wisconsin Department of Health & Social Services, Defendants-Appellants.

Supreme Court

*No. 91–0016. Oral argument February 1, 1994 and November 8, 1994.—Decided May 4, 1995.*

(Also reported in 531 N.W.2d 70.)

For the plaintiffs-appellants-petitioners there were briefs by *Timothy J. Aiken, Kelly L. Centofanti* and *Aiken & Scoptur, S.C.,* Milwaukee and oral argument by *Timothy J. Aiken.*

For the defendant-respondent-cross petitioner there were briefs by *Paul R. Erickson, Colleen M. Fleming* and *Gutglass, Erickson & Bonville, S.C.,* Milwaukee and oral argument by *Paul R. Erickson.*

For the defendant and third party plaintiff-respondent cross petitioner and for the defendant-respondent-cross petitioner there were briefs by *Timothy J. Strattner, Clare T. Ryan, Linda Vogt Mea-*

*gher* and *Schellinger & Doyle, S.C.,* Brookfield and oral argument by *Timothy J. Strattner.*

Amicus curiae brief was filed by *Mark L. Thomsen* and *Cannon & Dunphy, S.C.,* Brookfield for the Wisconsin Academy of Trial Lawyers.

WILLIAM A. BABLITCH, J. Cheryl Martin ran into the back of a truck while riding her bicycle. She was taken to the Fort Atkinson Memorial Hospital (FAMH) emergency room suffering from head injuries. The doctor failed to inform her father that a CT scanner was available to diagnose the extent of his daughter's head injuries. Further, the doctor failed to inform her father that if his daughter developed intracranial bleeding, there would be a significant delay in the ability to treat her because she would have to be transferred to a facility in Madison: FAMH did not have a neurosurgeon. A CT scan was not performed; intracranial bleeding developed approximately three hours after admission. Severe and permanent injuries resulted. The issue is whether sec. 448.30, Stats.,[1] required Dr. William H. Richards and Dr.

---

[1] Section 448.30, Stats., titled "Information on alternate modes of treatment" provides the following:

> Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physician's duty to inform the patient under this section does not require disclosure of:
>
> (1) Information beyond what a reasonably well-qualified physician in a similar medical classification would know.
>
> (2) Detailed technical information that in all probability a patient would not understand.
>
> (3) Risks apparent or known to the patient.
>
> (4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.

Mark Hansen to inform Robert Martin about the availability of the CT scan and the unavailability of a neurosurgeon should intracranial bleeding develop. The court of appeals concluded that Dr. Richards was required to do so, and we agree. Unlike the court of appeals, however, we do not remand for a new trial. We conclude that the failure of the verdict to contain a question on cause with respect to the issue of informed consent was not fatally defective because the parties waived such question. We conclude that the circuit court was correct in determining that sec. 448.30 was inapplicable to Dr. Hansen. Finally, we hold that the retroactive cap on noneconomic damages is unconstitutional and, accordingly, the Martins are entitled to their full award of noneconomic damages.

The underlying facts are as follows (other facts will be included as necessary throughout the opinion). On the evening of July 10, 1985, Ms. Martin, then 14 years old, ran into the back of a truck while riding her bicycle in Jefferson, Wisconsin. Ms. Martin was transported to FAMH where she arrived at approximately 10:40 p.m. Dr. Richards was staffing the hospital's emergency room that evening. He examined Ms. Martin when she came in, and again one hour later. Dr. Richards possessed these facts regarding Ms. Martin's condition:

1. She had run into the back of a dump truck while riding her bicycle;

2. She had been unconscious at the scene for an undetermined period of time;

3. She had vomited five or six times;

_____

(5) Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.

(6) Information in cases where the patient is incapable of consenting.

4. Amnesia had been observed;

5. There was swelling and bruising to the right zygomatic area, an area of the middle mingeal artery, one of the arteries commonly torn in instances of intracranial bleeding.

In light of these facts, his differential diagnosis was "concussion, contusion, and the possibility of intracranial bleeding."[2] In an attempt to determine which diagnosis was correct, he performed several neurological tests as well as skull x-rays. Based upon the results of these tests, Dr. Richards ultimately diagnosed Ms. Martin as having a concussion.

Dr. Richards conveyed this information to Mr. Martin. In addition, he explained that for a patient in Ms. Martin's condition, the appropriate courses of action were either to send them home under the care of a responsible adult, or to admit them to the hospital for observation. Dr. Richards felt that Ms. Martin should remain at FAMH and convinced Mr. Martin of the same.

In his conversation with Mr. Martin, Dr. Richards did not advise Mr. Martin that FAMH had a CT scanner on premises, nor did he tell Mr. Martin that such machines are able to diagnose serious head injuries. In addition, Dr. Richards did not inform Mr. Martin that should a neurological complication such as intracranial bleeding arise, while his daughter was at FAMH, she would have to be transferred to a different hospital because FAMH did not have a neurosurgeon.

---

[2] A "differential diagnosis" is defined as:

[T]he determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings. STEDMAN'S MEDICAL DICTIONARY 428 (25th ed. 1990).

Following his conversation with Mr. Martin, Dr. Richards contacted Dr. Hansen in order to have Ms. Martin admitted to FAMH (as the emergency room physician, Dr. Richards lacked authority to admit patients). Dr. Richards informed Dr. Hansen only that Ms. Martin: 1) had run into the back of a dump truck; 2) had suffered a brief period of unconsciousness; 3) had one episode of vomiting; 4) had normal bruises and scrapes. Upon being advised of this information Dr. Hansen authorized her admission. Dr. Hansen was at home when Dr. Richards contacted him, and he did not speak directly with Mr. Martin at this time.

At 12:15 a.m. on the morning of July 11, 1985, a nurse examining Ms. Martin found her somewhat irritable and uncommunicative. The nurse did not report this observation to either Dr. Richards or Dr. Hansen. One hour later, the nurse found Ms. Martin unresponsive and exhibiting a "blown" pupil in her left eye. The medical testimony at trial indicated that a "blown" pupil is a symptom of intracranial bleeding. The attending nurse immediately advised Dr. Richards of Ms. Martin's deteriorating condition. Dr. Richards in turn notified Dr. Hansen, who arranged for Ms. Martin to be taken via helicopter to the University of Wisconsin Hospital in Madison.

CT scans performed at UW Hospital revealed the existence of a large epidural hematoma in Ms. Martin's brain. Emergency surgery was performed at 3:55 a.m. A second operation was required later that day to relieve continued bleeding. These procedures were not completely successful. Although Ms. Martin survived, she is today a partial spastic quadriplegic.

At trial, the parties offered conflicting expert medical testimony on the following issues: 1) whether the diagnosis and/or treatment of Ms. Martin by Doctors

Richards and Hansen, particularly their failure to obtain a CT scan and their decision to admit Ms. Martin to FAMH, was negligent, 2) whether the care provided by FAMH staff, most notably those nurses who observed Ms. Martin, was negligent, and 3) whether Doctors Richards and Hansen failed to provide Mr. Martin the information required by sec. 448.30, Stats.

The jury determined that Doctors Richards and Hansen were not negligent in either their diagnosis or their treatment of Ms. Martin. With respect to the nurses, the jury found that their conduct was negligent, but that it was not a causal factor in Ms. Martin's injuries. The jury did, however, find that Dr. Richards negligently failed to inform Mr. Martin as to the existence of alternate forms of care and treatment. Accordingly, the jury awarded the Martins almost 5 million dollars in damages.

Following the verdict, the circuit court granted Dr. Richards' motion to dismiss that portion of the Martins' complaint relative to informed consent. The court believed that under sec. 448.30, Stats., the doctors had no duty to inform Mr. Martin about diagnostic or treatment alternatives with respect to what it characterized as the "extremely remote" possibility that his daughter would develop an intracranial bleed.[3]

The court of appeals reversed, taking issue with the circuit court's analysis of what constitutes an "extremely remote" possibility for purposes of sec. 448.30, Stats. "In view of the serious consequences of an epidural hematoma, we conclude as a matter of law that a one to three in a hundred chance that a patient

---

[3] Both the circuit court and the court of appeals relied upon testimony indicating that 1–3 percent of patients exhibiting Ms. Martin's symptoms may develop intracranial bleeding.

suffering a concussion will develop intracranial bleeding is not an 'extremely remote possibility.' " *Martin v. Richards,* 176 Wis. 2d 340, 350, 500 N.W.2d 691 (Ct. App. 1993). The court of appeals remanded the case to determine whether Dr. Hansen also breached his duty to inform, and whether the doctors' failure to provide the requisite information was a cause of Ms. Martin's injuries.

## I.

The first issue we address is whether the circuit court erred when it determined as a matter of law that Dr. Richards did not have a duty under sec. 448.30, Stats., to inform Mr. Martin of alternate viable medical treatments. This requires us to determine whether there was any credible evidence for the jury to determine whether Dr. Richards was negligent in failing to inform Mr. Martin: 1) that if Ms. Martin developed neurological complications from the head injury she would have to be transferred to a facility in Madison because FAMH did not have a neurosurgeon; and 2) that FAMH did have a CT scanner available which would detect any neurological complications resulting from the head injury.

The circuit court ruled as a matter of law that the doctor had no duty to disclose because the statute does not require disclosure of "extremely remote possibilities," *see* sec. 448.30(4), Stats., and a 1–3 percent chance of intracranial bleeding, the court reasoned, is remote. We disagree with the circuit court's conclusion that sec. 448.30 does not apply in this case. Like the court of appeals, we conclude that in light of the serious consequences, including death, of an intracranial bleed, a 1–3 percent possibility is not remote. Other

courts have likewise been quick to recognize that although the risk of a complication may be small, such risk may be significant to a patient's decision in light of the potentially severe consequences. *See, e.g., Canterbury v. Spence,* 464 F.2d 772, 788 (D.C. Cir. 1972), *cert. denied,* 409 U.S. 1064 (1972).

Having determined that the circuit court was incorrect in finding that the statute did not apply because of the "remote exception," we next determine whether there was any credible evidence for a jury to determine that Dr. Richards breached his duty to inform under sec. 448.30, Stats. To do so, we must state the statutory standard applicable in informed consent cases. Section 448.30, provides:

> **448.30 Information on alternate modes of treatment.** Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physician's duty to inform the patient under this section does not require disclosure of:
>
> (1) Information beyond what a reasonably well-qualified physician in a similar medical classification would know.
>
> (2) Detailed technical information that in all probability a patient would not understand.
>
> (3) Risks apparent or known to the patient.
>
> (4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.
>
> (5) Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.
>
> (6) Information in cases where the patient is incapable of consenting.

The first sentence in sec. 448.30, Stats., contains that statute's operative language: "Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments." This language appears clear in its directive. The difficulty in applying the statute, however, is in determining how far the duty to disclose extends, i.e., what is considered an alternate, viable mode of treatment. Dr. Richards argues that the duty extends only to affirmative, invasive treatments and does not extend to noninvasive or diagnostic procedures such as those involved in the case before us.

To determine the intended scope of the statute, we examine the development of the doctrine of informed consent and the codification of that doctrine in sec. 448.30, Stats. The term "informed consent" originally arose from the doctrine that consent to treatment is only meaningful if the patient understands the risks and alternatives of the treatment. This same term has been assigned to the doctrine which places a duty on physicians to disclose information as to the alternatives and risks of a particular treatment. *See Canterbury*, 464 F.2d at 780 n.15.

The doctrine of informed consent comes from the common law and stems from the fundamental notion of the right to bodily integrity: "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body; . . ." *Schloendorff v. Society of New York Hospital*, 105 N.E. 92, 93 (N.Y. 1914), overruled on other grounds. *See also In Matter of Guardianship of L.W.*, 167 Wis. 2d 53, 68, 482 N.W.2d 60 (1992) (recognizing the right to self-determination). Consent to treatment is only meaningful if it is given

169

by persons informed or knowledgeable about the various choices available and the risks attendant upon each. The court in *Canterbury,* 464 F.2d at 780, wrote in great detail of this concept:

> True consent to what happens to one's self is the informed exercise of choice, and that entails an opportunity to evaluate knowledgeably the options available and the risks attendant upon each. (Footnote omitted). The average patient has little or no understanding of the medical arts, and ordinarily has only his physician to whom he can look for enlightenment with which to reach an intelligent decision. (footnote omitted) From these almost axiomatic considerations springs the need, and in turn the requirement, of a reasonable divulgence by physician to patient to make such a decision possible. (Footnote omitted.)

Traditionally, informed consent was based upon the tort of battery. When a patient failed to authorize treatment or consented to one form of treatment and the physician performed a substantially different treatment, the patient had a cause of action for battery. *See, e.g., Corn v. French,* 289 P.2d 173 (Nev. 1955) (finding battery when patient consented to exploratory surgery and doctor performed mastectomy). Sharon Nan Perly, *From Control Over One's Body to Control Over One's Body Parts: Extending The Doctrine of Informed Consent,* 67 N.Y.U.L. Rev. 335, 339 (1992). The cases involving "failure to authorize treatment" often included instances where the patient had not received information about the risks associated with the medical procedure. *Id.* Thus, in order to avoid liability, the physician had to make adequate disclosures. *Id.*

An inherent difficulty existed, however, in applying the tort of battery to informed consent. A doctor's failure to disclose fit uncomfortably, or not at all, within the intentional, antisocial nature of battery; it was assumed that doctors acted in good faith when treating patients. *Trogun v. Fruchtman,* 58 Wis. 2d 569, 599, 207 N.W.2d 297 (1973). Further, unlike the usual battery case, patients had given some measure of consent, at least in the sense that the patient sought care from the doctor. Marjorie Maquire Shultz, *From Informed Consent to Patient Choice: A New Protected Interest,* 95 Yale L.J. 219, 225 (1985).

Accordingly, the basis for liability in informed consent cases changed to a negligence theory of liability: a physician's failure to obtain a patient's informed consent is a breach of a professionally-defined duty to treat a patient with due care. Perley, *From Control Over One's Body Parts,* 67 N.Y.U.L. Rev. at 339. Courts are split on how to apply a negligence theory to informed consent cases, however, differing on what constitutes "sufficient information" for purposes of disclosure. *Id.* at 340. Many courts only require disclosure of information that the patient can prove is customarily disclosed by other medical professionals. *Id.* The court in *Canterbury,* 464 F.2d at 784, however, recognized that this standard was inconsistent with patients' rights to make their own health care decisions:

> Respect for the patient's right of self-determination on particular therapy (footnote omitted) demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves. (Footnote omitted.)

Therefore, a growing number of courts require physicians to disclose what a reasonable person in the patient's position would want to know. Perley, *From Control Over One's Body Parts,* 67 N.Y.U.L. Rev. at 341. This objective standard was first enunciated in *Canterbury,* in which a patient sought damages for injuries sustained as a result of a negligently performed laminectomy and claimed that the physician had not disclosed the risks of serious disability inherent in the operation. *Canterbury,* 464 F.2d at 767–77. Recognizing that every human being has a right to make his or her own medical decisions, that real consent requires the informed exercise of choice which in turn requires knowledge of the alternatives and risks attendant upon each, and that the average patient has little understanding of medicine, the *Canterbury* court stated that the scope of a physician's communications must be:

> [M]easured by the patient's need, (footnote omitted) and that need is the information material to the decision. Thus the test for determining whether a particular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked. (Footnote omitted.)
>
> . . .
>
> '[a] risk is thus material when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy.' *Id.* at 780, 786–87.

The court in *Canterbury* also concluded that whenever the determination of what a reasonable person would

want to know is open to debate by reasonable people, the issue is one for the jury. *Id.* at 788.

The development of the doctrine of informed consent in Wisconsin mirrors that recited above, and like the growing number of courts, the doctrine is now based upon the standard expounded in *Canterbury.* In *Scaria v. St. Paul Fire & Marine Ins. Co.,* 68 Wis. 2d 1, 227 N.W.2d 647 (1975), the supreme court addressed whether the circuit court properly instructed the jury on informed consent when the court stated that the doctor's duty to inform was limited to disclosures that other good standing medical professionals would customarily disclose. *Id.* at 10. Citing *Canterbury,* the court determined that the instruction was improper because the need of a patient for information should not be limited to a "self-created custom of the profession." *Id.* at 12. It stated:

> We are not dealing primarily with the professional competence nor the quality of the services rendered by a doctor in his diagnosis or treatment. The right to be recognized and protected is the right of the patient to consent or not to consent to a proposed medical treatment or procedure. Because of the patient's lack of professional knowledge, he cannot make a rational reasonable judgment unless he has been reasonably informed by the doctor of the inherent and potential risks. *Id.*

Rather, the court stated that the standard in informed consent cases is as follows:

> In short, the duty of the doctor is to make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to

173

intelligently exercise his right to consent or to refuse the treatment or procedure proposed. *Id.* at 13.

In other words, the court in *Scaria* recognized that the standard for informed consent cannot be defined by the medical profession. The decision is not a medical decision. The decision must be made by the patient, and a patient cannot make an informed, intelligent decision to consent to a physician's suggested treatment unless the physician discloses what is material to the patient's decision, i.e., all of the viable alternatives and risks of the treatment proposed. The extent of the physician's disclosures is driven then, by what a reasonable person under the circumstances then existing would want to know, i.e., what is reasonably necessary for a reasonable person to make an intelligent decision with respect to the choices of treatment or diagnosis.

In 1981, the Wisconsin legislature codified the standard articulated in *Scaria* in sec. 448.30, Stats. *See* Laws of 1981, c. 375 sec. 2. *See also Analysis by the Legislative Reference Bureau,* 1981 A.B. 941:

> This bill places in the statutes the standard of care that physicians are required to meet under *Scaria.* The bill requires physicians who treat patients to inform their patients about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments.

The language of the statute parrots that of the language in *Scaria,* requiring physicians to disclose alternate, viable forms of treatment and the risks and benefits of those treatments. Presumably the use of the word "viable" in the statute was intended to require

disclosure to the extent mandated in *Scaria:* disclosure only of information reasonably necessary for a patient to intelligently exercise his or her choice regarding medical treatment. Thus, the duty imposed by the statute is dependent upon the facts of the situation. The information that is reasonably necessary for a patient to make an informed decision regarding treatment will vary from case to case.

In addition, the duty under the statute is not limited to affirmative violations of bodily integrity. There can be no dispute that the language in *Scaria,* 68 Wis. 2d at 13, requires that a physician disclose information necessary for a reasonable person to make an intelligent decision with respect to the choices of treatment or diagnosis. Because this standard was adopted by the legislature, as indicated by the LRB notes, the phrase "modes of treatment" in sec. 448.30, Stats., should not be construed so as to unduly limit the physician's duty to provide information which is reasonably necessary under the circumstances. Such a reading would be contrary to *Scaria.* Certainly, procedures which are purely diagnostic in nature are not excluded from sec. 448.30's reach. In *Scaria,* itself, the plaintiff's injuries resulted from complications associated with an aortogram, a diagnostic procedure. *Id.* at 4. The distinction between diagnostic and medical treatments is not in and of itself significant to an analysis of informed consent. *See, e.g.,* Annotation, *Medical Malpractice: Liability For Failure of Physician to Inform Patient of Alternative Modes of Diagnosis or Treatment,* 38 A.L.R. 4th, 900, 903:

> [I]t may safely be stated that, as part of the physician's duty to obtain a patient's informed consent to any medical procedure employed by the physician

in dealing with the patient, there is a duty imposed on the physician to disclose to the patient the existence of any methods of diagnosis or treatment that would serve as feasible alternatives to the method initially selected by the physician to diagnose or treat the patient's illness or injury.

*But see McGeshick v. A.K. Choucair, M.D.,* 9 F.3d 1229, 1233–35 (7th Cir. 1993) (concluding that sec. 448.30 does not impose a duty to inform a patient of methods of diagnosis).

Similarly, we do not believe that a physician is necessarily absolved from providing pertinent medical information simply because the procedure he or she recommends is noninvasive. It is easy to envision a scenario where observation in lieu of more aggressive treatments entails significant risks which a reasonable patient would want to know.

The applicable statutory standard in informed consent cases in Wisconsin which is explicitly stated in *Scaria* and subsequently codified in sec. 448.30, Stats., is this: given the circumstances of the case, what would a reasonable person in the patient's position want to know in order to make an intelligent decision with respect to the choices of treatment or diagnosis? A physician who proposes to treat a patient or attempt to diagnose a medical problem must make such disclosures as will enable a reasonable person under the circumstances confronting the patient to exercise the patient's right to consent to, or to refuse the procedure proposed or to request an alternative treatment or method of diagnosis. Under this standard, we determine whether there was any credible evidence for the jury to determine whether a reasonable person under the circumstances confronting Mr. Martin would have

wanted to know about the availability of a neurosurgeon at FAMH and a CT scan. Accordingly, we consider in detail the facts of the case as they were presented to the jury.

The jury was made aware that Dr. Richards possessed these salient facts regarding Ms. Martin's condition when he diagnosed and treated Ms. Martin:

1. She had run into the back of a dump truck while riding her bicycle;

2. She had been unconscious at the scene for an undetermined period of time;

3. She had vomited five or six times;

4. Amnesia had been observed;

5. There was swelling and bruising to the right zygomatic area, an area of the middle mingeal artery, one of the arteries commonly torn in instances of intracranial bleeding.

In light of these facts, Dr. Richards' differential diagnosis was "concussion, contusion, and the possibility for delayed intracranial bleeding." Dr. Richards stated at his deposition on June 24, 1987, that: "Every individual who loses consciousness and then regains it carries the possibility of [intracranial bleeding]." An expert, Dr. John Whitcomb (Dr. Whitcomb) agreed: "One of the classic presentations of a child who's seriously injured with an epidural hematoma is the person who is unconscious. . . ."

In addition, the experts at trial added that the presence of nausea, vomiting and amnesia were additional signs of a more serious head injury. For example, Dr. Whitcomb testified:

177

The things you need to watch for critically are: Is your child becoming increasingly lethargic,—just general principle is kind of getting run out of gas. Are they getting a seizure. Are they having one pupil dilate. Are they vomiting more than once or twice or three times. And I typically tell people once vomiting is okay, twice you're going to have a CT scan. That's a standard, simple formula. We just say once is okay, we'll let you vomit once. Twice you found yourself in the CT Suite because that's a sign of pressure building up inside your head. And vomiting is one of the most common, the most common indicators for serious brain injury. For me, its very, very important that we follow that issue.

In an attempt to determine which diagnosis was correct, Dr. Richards performed on Ms. Martin several neurological tests as well as skull x-rays. In the end, Dr. Richards ultimately diagnosed concussion.

In diagnosing a concussion, Dr. Richards did not, however, completely eliminate the possibility of intracranial bleeding. After diagnosing Ms. Martin's condition, Dr. Richards contacted Dr. Hansen, told Dr. Hansen of Ms. Martin's condition and made clear to Dr. Hansen that he wanted to keep Ms. Martin in the hospital for neurological observation. In addition, when talking to Mr. Martin, Dr. Richards informed him about the possibility of neurological complications and his desire to keep Ms. Martin at FAMH. In fact, when asked at trial about Mr. Martin's ultimate decision to keep Ms. Martin at FAMH, Dr. Richards stated that "I believe I convinced [Mr. Martin] into keeping her there." Further, Dr. Richards (knowing of the inherent risk of intracranial bleeding) admitted Ms. Martin to the hospital for "careful neurological followup." Dr. Richards explained that "careful neurological followup" meant that people in the hospital would

observe Ms. Martin to watch carefully for signs of or symptoms of neurological deterioration.

Based upon the facts presented, it is clear that the potential existed for serious neurological complications, namely intracranial bleeding, when Dr. Richards admitted Ms. Martin to FAMH. All experts agree that if intracranial bleeding does occur, immediate action must be taken to treat it. Despite this, Dr. Richards did not tell Mr. Martin two very significant pieces of information relevant to Ms. Martin's treatment. Dr. Richards did not tell Mr. Martin that if intracranial bleeding occurred FAMH could not treat it, and that Ms. Martin would have to be transferred to a hospital in Madison where a neurosurgeon was located. Dr. Richards also did not tell Mr. Martin that a CT scan was available which would detect intracranial bleeding. This piece of information was significant in Ms. Martin's situation because it would have given Mr. Martin the information needed to conclusively determine whether Ms. Martin needed to be treated by a neurosurgeon.

Several of the experts at trial stated that the Martins should have been informed of the alternate modes of treatment. Dr. Whitcomb answered affirmatively to the following question:

> Doctor, would the average physician exercising reasonable care July of 1985 in your opinion provide the information that you have just outlined about CAT Scanning and transfer so that the parents could make an informed decision as to whether or not to request it?

The following question and answer occurred during the questioning of Dr. Imse:

179

Q: 'Would you agree that the reasonable physician exercising reasonable care must tell that type of information to the Martins in this case?'

A: 'I think a reasonable physician using reasonable care, assuming the Martins are reasonable people, should tell them, yes.'

Even Dr. Richards himself, testified that the Martins had a right to know that FAMH did not have a neurosurgeon on staff:

Q: Okay. Then you would say that—that, in your opinion, the Martins didn't have the right to know that there was no neurosurgeon on board or available at Fort Atkinson?

A: I think they had a right to know. I agree with that.

Dr. Richards argues the statute should not impose a duty upon doctors to inform patients of alternate treatments for a condition not diagnosed or not being treated by the physician. That argument ignores the facts in this case. Dr. Richards believed Ms. Martin had a concussion. He did not believe she was bleeding *at the time* he diagnosed concussion. But given the circumstances of this case, that does not end the inquiry. Dr. Richards knew that delayed intracranial bleeding was a condition of his diagnosis. He could not rule it out. He knew there was a distinct possibility that intracranial bleeding might occur. In sum, he knew that Ms. Martin's condition was more serious than a simple concussion. He knew that associated with this concussion was the possibility of a delayed intracranial bleed. It was this condition (the excessive vomiting, the amnesia, the unconsciousness of an undetermined time, the injury to the head), not the diagnosis, that drives the

duty to inform in this case. The statute speaks to information about alternate modes of treatment; it is not limited in title or in text to "Information on alternate modes of treatment *for diagnosis.*"

Dr. Richards further argues that these are medical decisions. In essence he states, "Why should we inform the patient that we don't think we should do something?" This misses the very point of the statute. When a reasonable person would want to know, the decision is not the doctor's alone to make. Here the doctor was concerned about the possibility of an intracranial bleed. When a reasonable person would want to know about an alternative treatment or method of diagnosis such as a CT scan or hospitalization in a facility with a neurosurgeon, the decision is not the doctor's alone to make.

It may well be a "medical decision" under these circumstances to decide not to do a CT scan, or to decide not to hospitalize the patient in a hospital that can treat an intracranial bleed if it should occur. The statute on its face says, however, that the patient has the right to know, with some exceptions, that there are alternatives available. The doctor might decide against the alternate treatments or care, he might try to persuade the patient against utilizing them, but he must inform them when a reasonable person would want to know. Here, Mr. Martin could have decided to have a CT scan done or could have decided to take Ms. Martin to another hospital with a neurosurgeon. In fact, the jury found that Mr. Martin would have agreed to the alternate forms of care and treatment had he been informed of their availability.

Based upon all of the evidence, especially that which indicates the seriousness of Ms. Martin's head

injury at the time she was admitted, we conclude that there was credible evidence for the jury to determine that in order to make an intelligent decision regarding the choices of treatment or diagnosis, a reasonable person, under the circumstances then existing, would have wanted to know: 1) that if Ms. Martin developed neurological complications from the head injury she would have to be transferred to a facility in Madison because FAMH did not have a neurosurgeon; and 2) that FAMH did have a CT scanner available which would detect any neurological complications resulting from the head injury. The jury, when presented with this question, found that a reasonable person would want to know this information. The jury's decision on informed consent should stand. Therefore, we reinstate the jury verdict on this issue.

## II.

We turn now to the issue of cause. More specifically, we address the question: Was the verdict fatally defective in that it did not require the jury to determine whether Dr. Richards' negligence in failing to inform Mr. Martin was a cause of Ms. Martin's injuries?

We begin by acknowledging that all parties agree that the special verdict did not contain a typical cause question. Having answered in the affirmative the question of whether Mr. Martin would have agreed to the alternate forms of care and treatment had he been informed of their availability, the jury must then be asked, in effect, whether the alternate forms of care and treatment would have made a difference, i.e., whether the same or similar injuries would have resulted even if the injured party availed himself or herself of the alternate treatment. The court of appeals determined that the special verdict was fatally defec-

tive in that it did not contain a cause question. As a result, the court exercised its discretionary authority under sec. 752.35, Stats., to reverse the judgment as to Dr. Richards because the real controversy had not been tried.

■

A new trial is neither necessary nor appropriate. We conclude that the failure of the verdict to contain a question with respect to cause on the issue of informed consent was not, in this case, fatally defective. The parties waived such question. We so conclude for three reasons.

First, all parties, including Mr. Strattner[4] (attorney for Dr. Richards) understood and agreed that an affirmative answer to special verdict Question #4 (Question #4), would establish causation on the issue of informed consent if the jury agreed in special verdict Question #3 (Question #3) that Dr. Richards was negligent in failing to inform Mr. Martin of alternate forms of care and treatment. Question #4 asked whether a reasonable person in Mr. Martin's position would have agreed to the alternate forms of care and treatment had he been informed of their availability. The jury so found.

Second, Mr. Strattner failed to object to the lack of a cause question on the issue of informed consent.

Third, Mr. Strattner successfully argued that an arguably curative instruction should not be given to the jury. Having succeeded in precluding such an instruction, he can scarcely argue now that the judge's failure to do so results in error.

---

[4] Because this section largely deals with the actions of the attorneys who represented the plaintiffs and defendants in this case, we refer to them by name, understanding full well that they simply represent the interests of the actual parties.

We will address each of these reasons in turn.

First, all parties understood and agreed that an affirmative answer to Question #4 would establish causation on the issue of informed consent if the jury agreed in Question #3 that Dr. Richards was negligent in failing to inform Mr. Martin of alternate forms of care and treatment.

Question #4 of the verdict reads in its entirety:

> If you answered Question No. 3 'Yes,' then answer this question:
> Would a reasonable person in Robert Martin's position have agreed to the alternate forms of care and treatment had he been informed of their availability? (Yes or No).

The jury answered "Yes." (Question #3 asked whether Dr. Richards was negligent in failing to inform Mr. Martin of alternate forms of care and treatment, the so-called "informed consent" question. The jury answered "Yes.")

When this issue was first raised at motions after verdict, the circuit court judge made clear his recollections. The court was unequivocal that Question #4 was intended to be the cause question on the issue of informed consent and that this was the agreement of all parties:

> [I]n any case, [Question #4] was intended to be the cause question because we had discussion among counsel with the court . . . .
>
> . . .
>
> *[S]o we decided, because this one would be here, that that would be the cause question, inferring that cause was there if the doctor was negligent, and Mr. Martin would have agreed to the other treatment.*

184

That is the absolute essence of the matter. (Emphasis added.)

A review of the record amply illustrates that the judge was correct in his recollection that Question #4 was intended to be the cause question. Not only does the record reflect that all of the participants were well aware of the need for an informed consent cause question, the record is replete with references to their understanding that Question #4 was the cause question on the issue of informed consent.

For example, page 36:

MR. STRATTNER: That would be my request that the—did the doctor adequately inform the patient—I mean, I don't know what else—when you start putting specific things in—I mean, obviously did they adequately inform the patient that there was no neurosurgeon there, that's not a jury question.

THE COURT: Do you need another question then that says—

MR. STRATTNER: *Was it a cause?* (Emphasis added.)

THE COURT: Yeah. You need that . . . .

Again, on page 49 of the transcript, the judge referred to the issue of cause on the informed consent issue:

THE COURT: . . . let's get back to the verdicts before we go any further. Richards, was he negligent, was he negligent in not informing? *Were each of those a cause?* (Emphasis added.)

Again, on page 112, Mr. Strattner and Mr. Erickson (representing Dr. Hansen), continued to show their

awareness of the cause issue regarding informed consent:

> MR. STRATTNER: [T]here is a separate pattern instruction 1023.3 on Cause in informed consent cases, and I would request that at some point . . ..

> MR. ERICKSON: The verdict question is a little different, too.

> THE COURT: The verdict question where, is different from what?.

> MR. ERICKSON: Than the standard *cause question* on the verdict on— (Emphasis added.)

Reading through the entire transcript of the conference, it is clear that at conference Mr. Strattner, aware that a cause question was needed, believed that the "cause" question on the issue of informed consent was Question #4. Beginning on page 112 of the conference transcript, Mr. Strattner, referring to Question #4, suggested personalizing the question to Mr. Martin.

> MR STRATTNER: If the court looks at the comment to 1023.3 [Cause in informed consent cases] if you have the book there.

> THE COURT: I do

> MR. STRATTNER: Right down toward the bottom they suggest that the jury question, 'Would a reasonable person in plaintiff's position have refused to consent to the proposed treatment,' I guess, 'had he been informed of the risks and advantages of such proposed treatment?' Instead of 'plaintiff's position' we could make it 'Mr. Martin's position' if that's what—I mean, if we want to personalize it.

186

THE COURT: *That's the cause question?* (Emphasis added.)

MS. KAISER (representing Fort Atkinson Memorial Hospital): I think you want to flip-flop the way it's phrased, don't you?

MR. STRATTNER: How do you mean?

MS. KAISER: Rather than saying 'refused' [insert] 'would he have approved?'

MR. STRATTNER: Yeah . . ..

Any doubt that might remain as to whether Mr. Strattner believed that Question #4 was the "cause" question is resolved beginning with the transcript on page 115 and following:

MR. STRATTNER: . . . I have a problem with this, your Honor, because I don't think that the informed consent is properly an issue in the case, *but it seems to me that if it is an issue in the case then we are entitled to a verdict question framed in terms of not what Mr. Martin testified he would do, but what would a reasonable person informed of the alternatives (do) . . ..*" (Emphasis added.)

THE COURT: They are saying the following *alternate cause question* might be easier for juries to understand . . ... So if we rephrased the verdict to say, 'Would a reasonable person in Robert Martin's position have refused to consent to the proposed treatment had he been informed of the risks and advantages of such treatment?' *And you want to substitute that for the cause question I have no problem.* Do you have a problem, Mr. Aiken? (Emphasis added).

MR. AIKEN (representing the Martins): No, except I think Ms. Kaiser might be right that it's

187

stated in a negative instead of the affirmative. Isn't that what you said before?

THE COURT: 'Would a reasonable person in Robert Martin's position have agreed to the proposed treatment, approved of, 'I don't care.

MR. STRATTNER: I think rather than 'proposed treatment' it would need to be 'alternate treatment' or something.

A reading of the final version of Question #4 illustrates that Mr. Strattner and Ms. Kaiser got their wish. Question #4 was changed to a reasonable person standard, it was stated in the affirmative, and "proposed treatment" was changed to "alternate treatment." All of this was done with the judge and the parties referring to Question #4 as the "cause" question on informed consent. Mr. Strattner got precisely what he wanted.

The next question is why would Mr. Strattner concede that Question #4 was the "cause" question on informed consent? That question reads, in effect: "Would a reasonable person in Mr. Martin's position avail himself of the alternate forms of care and treatment had he been informed of their availability?" Mr. Aiken (representing the Martins) and Mr. Strattner point to the same part of the conference transcript (quoted directly below) to support their respective positions. Mr. Aiken's position is that this dialogue proves that Mr. Strattner agreed that Question #4 was determinative of cause, and therefore there was no reason for any further question. Mr. Strattner's position is just the opposite.

From page 65:

MR. STRATTNER: . . . the facts that we have in this case are that Mr. Aiken has elicited testimony

188

from people that, if something was done before Cheryl Martin's pupil was blown, she'd be 99 percent okay today.

THE COURT: Um-hum.

MR. STRATTNER: I for one don't care about the 1 percent . . .

THE COURT: You're willing to concede it's an all-or-nothing proposition.

MR. STRATTNER: I think it is in terms of the testimony we got, unless Mr. Aiken intends to argue something else. I guess I am not sure.

I mean, if his argument is that something should have been done so that Cheryl Martin was operated on before 1:15 in the morning, then it's 99 percent certain that they would have caught it, and I don't know why we can't get ourselves involved in all kinds of loss of chance or anything else—

THE COURT: Wonderful . . . Mr. Erickson, . . . you're of the same view?

MR. ERICKSON: I agree with the fund.

. . .

MS. KAISER: . . . I am not going to disagree with the Fund either.

From page 102:

MR. STRATTNER: Your Honor, I guess I go back to the testimony that it would have been 99 percent successful, and why we're going to get bogged down now for another however long it takes in *Ehlinger versus Sipes,* I am willing to give up the 1 percent just to clean up the verdict and the instructions, and this isn't a lost opportunity case, it seems to me. *Most of the experts have said 99 percent recovery.* (Emphasis added.)

189

With respect to the above quotes from the conference, Mr. Strattner states in his brief to this court that "Defense counsel agreed not to challenge plaintiffs' expert's testimony that, had there been timely neurosurgical intervention, there was a 99% chance that Ms. Martin would not have suffered the injuries she did." Mr. Strattner's position in this court is that the key word is "timely." He argues now that even if Mr. Martin had been informed of the alternatives and agreed to them, timely intervention was virtually impossible. In essence, Mr. Strattner's position is that he intended on arguing that the failure to inform could not have caused Ms. Martin's injury because even if he had informed Mr. Martin about the alternate forms of treatment, Ms. Martin's injuries would have occurred before anything could have been done. In his brief to this court, he states, "[i]t permitted the defense to argue that even given a 100% probability that timely neurosurgical intervention would have prevented Ms. Martin's injuries, the outcome would be the same because the undisputed facts regarding travel time . . . scanning time and surgery time, show that timely intervention was virtually impossible." Thus, he says now, he never conceded the issue of cause.

We might be able to accept Mr. Strattner's position as to just what it was he conceded in the "99 percent" language quoted above if he had argued that position in front of the jury. He did not. In his brief he says he conceded only to clear up jury confusion so that he could argue to the jury that Ms. Martin's intracranial bleed and subsequent condition would have occurred even if timely intervention had occurred. But he did not make that argument to the jury. He argued Question #4 only to the effect that a reasonable person would not have availed himself or herself of alternate forms of

190

treatment. See pgs. 79–86, Transcript of Closing Arguments.

Mr. Aiken argues that the above statements regarding the 99 percent chance for recovery must be interpreted to mean that Mr. Strattner conceded that the answer to Question #4 was determinative as to cause. In other words, Mr. Strattner was willing to concede the 1 percent, and admit that if the jury answered "Yes," to Question #4, the causation was implicit because all the evidence before the jury was that if Mr. Martin had availed himself of the alternate treatment or care before Ms. Martin's pupil was blown, Ms. Martin's injuries would not have occurred.

We conclude that the evidence before us, particularly the transcripts of the verdict and instruction conference, as well as the closing arguments transcript, support Mr. Aiken's position: Mr. Strattner conceded that an affirmative answer by the jury to Question #4 established causation with regard to the issue of informed consent. He was well aware of the need for a cause question on that issue. He never objected to the agreed upon verdict. He participated in many dialogues in which Question #4 was referred to as "the cause question." He got what he wanted in the final form of Question #4. Finally, the arguments he makes in his brief today are not supported by the arguments he made to the jury nor by the language he employed in making the concession.

We therefore conclude that the verdict submitted in this case was sufficient to establish a causal connection between Dr. Richards' negligence in failing to inform and Ms. Martin's subsequent injuries. The jury agreed that had Mr. Martin been informed, he would have submitted his daughter to the alternate forms of treatment. Causation on the issue of informed consent

was conceded and it was, therefore, for purposes of this case, implicit within Question #4. Dr. Richards con-ceded that had there been timely intervention, it would have mattered: Ms. Martin's injuries would not have occurred.

A second reason for concluding that the verdict in this case was not fatally defective is based on Mr. Strattner's failure to object to a cause question on the issue of informed consent. At the second oral argument held in this matter, Mr. Strattner insisted that he had made such an objection. We have carefully reviewed the record. Although he objected to including in the verdict any question with respect to informed consent, we find no objection with respect to the failure of the verdict to contain a cause question on the issue of informed consent.

Section 805.13(3), Stats., requires that counsel "object to the proposed . . . verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record." Failure to object constitutes a waiver of any error in the proposed instructions or verdict. An objection to the verdict prior to its submission to the jury allows the circuit court to hear all arguments and correct any error. Equally important, an objection provides the reviewing appellate court with the necessary information to determine precisely what happened at trial.

Requiring an objection serves another purpose as well. It prevents parties from "inviting error" at trial so as to assure reversal or remand on appeal. We do not conclude that the parties here invited error. We simply recognize that requiring objections serves to prevent this from occurring.

There is a third and separate reason why we do not remand this matter for a new trial for failure to include a cause question in the verdict on the issue of informed consent. As the court of appeals noted, Mr. Aiken preserved his objection to the lack of a cause question as to Dr. Richards' negligence in failing to inform, when he argued that an instruction be given which would incorporate the "substantial factor" cause question. Mr. Strattner argued the contrary position. Mr. Strattner prevailed. Having urged the circuit court to take one course of action, he can scarcely complain now that he succeeded.

> Mr. Aiken: *I hate to be someone raising something* and everybody has said they don't want to deviate from the standard instruction, *it seems that the cause instruction ought to have something about referring to the substantial factor rule—you don't have to read it again, but it ought to at least refer to the substantial factor rule. . . .*
>
> . . .
>
> There should be substantial factor at the end of that instruction. . . .
>
> I want to put on the record that it belongs there . . ..
>
> . . .
>
> Mr. Strattner: *No.* I am not going to argue this point . . .. I just can't do it, that's all.
>
> . . .
>
> *I don't think it's necessary.* I will say for the record I don't think it's necessary . . .. (Emphasis added.)
>
> Mr. Aiken: Like I said, Judge, it seems to me it says a causal relationship exists. That's the first thing we have to show, and the other thing we have

to show is that it's a sub—and that it was a substantial factor in causing harm to the plaintiff . . ..

. . .

Mr. Strattner: Mr. Aiken, you want to say you want to tag on a sentence that says—

Mr. Aiken: 'And said alternative treatment could have prevented the harm so as to be a substantial factor in causing harm.'

Mr. Strattner: I think you're confusing things more.

Mr. Strattner prevailed.

For all the reasons stated, we hold that the failure of the verdict to contain a question with respect to cause on the issue of informed consent was not, in this case, fatally defective.

## III.

The next issue we address is whether the circuit court erred in not allowing a verdict question with respect to whether Dr. Hansen was negligent in failing to inform Mr. Martin of alternate forms of treatment and care available for Ms. Martin. In doing so, we must determine whether the duty in sec. 448.30, Stats., applies to Dr. Hansen in this case. The application of a statute to a given set of facts is a question of law. *Tahtinen v. MSI Ins. Co.,* 122 Wis. 2d 158, 166, 361 N.W.2d 673 (1985).

The standard required by the statute, as more fully set out in section I of this opinion is: given the circumstances, what would a reasonable person want to know? The applicability or inapplicability of this statute must be determined in light of the standard enunciated.

194

Dr. Hansen argues that the statute is not applicable to him under the circumstances presented. We agree. The circumstances with respect to Dr. Hansen are significantly different from those with respect to Dr. Richards. Dr. Richards knew that Ms. Martin had: 1) run into the back of a dump truck; 2) been unconscious for an indeterminable amount of time; 3) vomited or been nauseous five or six times; 4) suffered a period of amnesia; and 5) had swelling and bruising to the right zygomatic area, an area of the middle mingeal artery, one of the arteries commonly torn in instances of intracranial bleeding.

In stark contrast, Dr. Hansen knew only what Dr. Richards informed him over the phone. The record is uncontradicted that Dr. Hansen knew only that Ms. Martin: 1) had run into the back of a dump truck; 2) had suffered a brief period of unconsciousness; 3) had one episode of vomiting; and 4) had normal bruises and scrapes. He did not know that there were five or six episodes of vomiting or nausea. He did not know any particulars about the bruises and scrapes. He did not know about any period of amnesia. He did not know whether her neurological exam was normal.

■■■

Given these circumstances, we conclude that the circuit court was correct in determining that sec. 448.30, Stats., was inapplicable to Dr. Hansen. We conclude as a matter of law that, had Dr. Hansen been the examining physician and, after examination, knew only what he knew from the telephone call he had with Dr. Richards, a reasonable person would not expect to be told by Dr. Hansen of other treatment alternatives. Therefore, the evidence presented at trial with regard to Dr. Hansen was insufficient to support a verdict question on whether Dr. Hansen violated the duty to

inform statute. The evidence shows that the information Dr. Hansen possessed indicated nothing more than a simple concussion. We therefore reverse the court of appeals on this issue and affirm the circuit court.

## IV.

Finally, we turn to the issue of the constitutionality of the statutory cap on noneconomic damages in sec. 655.017, Stats. In order to understand the arguments made with respect to the cap, it is important to understand the chronology of certain events in this action. Ms. Martin was injured on July 10, 1985. Her initial injury was aggravated on that day when Mr. Martin was not properly informed of the alternate modes of treatment available to treat Ms. Martin's injuries. At this time, no cap existed on noneconomic damage awards in medical malpractice actions. On June 13, 1986, however, 1985 Act 340 sec. 30, instituting sec. 655.017, was published and became law one day later on June 14, 1986. Section 655.017 provides:

> **655.017 Limitation on noneconomic damages.** The amount of noneconomic damages recoverable by a claimant or plaintiff under this chapter for acts or omissions of a health care provider if the action is filed on or after June 14, 1986 and before January 1, 1991, and for acts or omissions of an employe of a health care provider, acting within the scope of his or her employment and providing health care services, for actions filed on or after June 14, 1986 and before January 1, 1991, is subject to limit under s. 893.55(4).

Section 893.55(4) (created in 1985 Wis. Act 340 sec. 72) limits the total noneconomic damages[5] for each occurrence to $1,000,000 (adjusted to the consumer price index) for actions filed on or after June 14, 1986. The Martins filed this action on August 16, 1988, seeking damages for the economic and noneconomic injuries sustained by Ms. Martin as a result of the medical malpractice.

On August 1, 1990, the jury awarded the Martins $2,150,000 in noneconomic damages. If the cap on noneconomic damages in sec. 655.017, Stats., were applied to the Martins, their noneconomic damages would be limited to $1,000,000. We address the constitutionality of such application.

The Martins argue: (1) that the cap violates substantive due process of law secured by Art. I sec. 1 of the Wis. Constitution; (2) that the cap violates the right to trial by jury secured by Art. I sec. 5 of the Wis. Constitution; (3) that the cap violates their right to a remedy for vested, personal injuries secured by Art. I sec. 9 of the Wis. Constitution; (4) that the cap violates their right to equal protection secured by Art. I sec. 1 of the Wis. Constitution; and (5) that the cap "retroactively" impairs their vested right to a cause of action in violation of the due process clause of the Fifth Amendment of the United States Constitution and Art. I sec. 1

---

[5] "Noneconomic damages" are defined in sec. 893.55(4)(a), Stats., which provides in relevant part:

'[N]oneconomic damages' means moneys intended to compensate for pain and suffering; humiliation; embarrassment; worry; mental distress; noneconomic effects of disability including loss of enjoyment of the normal activities, benefits and pleasures of life and loss of mental or physical health, well-being or bodily functions; loss of consortium, society and companionship; or loss of love and affection.

of the Wisconsin Constitution.[6] We conclude that under the appropriate due process analysis for retroactive legislation outlined below, the private interest here, i.e., the right to unlimited damages, including considerations of fundamental fairness, outweighs the minimal, if any, public interest served by the retroactive application of the damage cap. Therefore, retroactive application of the cap violates the Due Process Clauses of the United States and Wisconsin Constitutions. We do not address the other constitutional issues raised.

As an initial matter, we must first address Dr. Richards' and the Patients Compensation Fund's (the Fund)[7] claim that sec. 655.017, Stats., is a prospective

---

[6] The Fifth Amendment of the United States Constitution, which applies to the states via the Fourteenth Amendment, provides in pertinent part: "No person shall . . . be deprived of life, liberty, or property, without due process of law."
Article I § 1 of the Wisconsin Constitution provides:

All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed.

This court recognized in *State ex rel. Briggs & Stratton v. Noll,* 100 Wis. 2d 650, 657, 302 N.W.2d 487 (1981) (citing *Haase v. Sawicki,* 20 Wis. 2d 308, 311 n.2, 121 N.W.2d 876 (1963)), that:

'It is well settled by Wisconsin case law that the various freedoms preserved by sec. 1. art. I, Wis. Const., are substantially the equivalent of the due-process and equal-protection-of-the-laws clauses of the Fourteenth amendment to the United States constitution. *Pauly v. Keebler* (1921), 175 Wis. 428, 185 N.W. 554; *Boden v. Milwaukee* (1959), 8 Wis. (2d) 318, 324, 99 N.W. (2d) 156; and *Lathrop v. Donohue* (1960), 10 Wis. (2d) 230, 235, 102 N.W. (2d) 404.'

[7] The Patients Compensation Fund was created in sec. 655.27, Stats., to act as the excess insurer in medical malprac-

statute, i.e., that it applies prospectively to those who file claims on or after June 14, 1986. If the statute is prospective it need not overcome the unique burdens placed upon retroactive laws. We conclude that the cap has a retroactive effect as applied to the Martins. The cap became effective on June 14, 1986, and affects claims filed after that date and before January 1, 1991. The Martins' cause of action accrued prior to the cap's enactment, on July 10, 1985, when Ms. Martin's injuries from the initial accident were aggravated by Dr. Richards' negligence. "[A] cause of action for negligence is said to accrue . . . on the date of the plaintiff's injury: 'It is the fact and date of injury that sets in force and operation the factors that create and establish the basis for a claim of damages." *Hunter v. Sch. Dist. Gale-Ettrick-Trempealeau,* 97 Wis. 2d 435, 442, 293 N.W.2d 515 (1980). Since the cause of action accrued at a time when no cap existed on the amount of noneconomic damages recoverable, application of the cap to the Martins' cause of action constitutes a retroactive application. If we allowed the cap, it would act here to limit the recovery of a cause of action which, when it accrued, was unlimited.

It is clear that the legislature intended the cap to be given retroactive effect. We recognize that "[t]he general rule in Wisconsin is that 'legislation is pre-

---

tice actions. The statute permits the Fund to be named as a party in actions for "damages arising out of the rendering of medical care." *See* Section 655.27(5)(a). When so named, the Fund is required to pay the portion of the judgment or settlement against a health care provider in excess of the statutory limit for the provider's individual financial responsibility. *See* sec. 655.27(5)(d). For actions occurring before July 1, 1987, the Fund pays the excess of any one claim over $200,000. *See* sec. 655.23(4).

199

sumed to be prospective unless the statutory language clearly reveals by express language or necessary implication an intent that it apply retroactively.' " *Chappy v. LIRC,* 136 Wis. 2d 172, 180, 401 N.W.2d 568 (1987) (quoting *State v. ILHR Department,* 101 Wis. 2d 396, 403, 304 N.W.2d 758 (1981)). However, the statute and its history overcome that presumption.

The cap applies to actions "filed on or after June 14, 1986." This language must encompass actions which accrued at an earlier date: in order for an action to be "filed" on June 14, 1986, it must have accrued prior to that date. The legislative history suggests that the legislature deliberately chose this retroactive application. The phrase "occurring after" appeared in an early version of 1985 Wis. Act. 340. However, it was subsequently deleted and replaced by "filed on or after," suggesting that the legislature wanted the Act to apply to actions which accrued prior to the Act's effective date. *See* Drafter's Note from the Legislative Reference Bureau at 3 (May 15, 1986), and the accompanying preliminary bill draft. *See also Hall v. A.N.R. Freight Sys. Inc.,* 717 P.2d 434, 441 (Ariz. 1986) (concluding that the terms "filed on or after the effective date" indicated the legislature's intent to have the Act apply retroactively to actions which accrued prior to the effective date).

Because the cap applies retroactively and was intended to apply retroactively, we reach the question of whether the retroactive application of the cap on noneconomic damages is constitutional.

Retroactive legislation enjoys a presumption of constitutionality, and the challenger bears the burden of overcoming that presumption. *Chappy,* 136 Wis. 2d at 192 (citing *Pension Benefit Guaranty Corp. v. R.A.*

*Gray & Co.,* 467 U.S. 717, 729 (1984)). However, because retroactive legislation presents unique constitutional problems in that it often unsettles important rights, it is viewed with some degree of suspicion and must be analyzed within a framework different from that of prospective legislation. "The [retroactive] aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 17 (1976).

To determine whether a retroactive statute comports with due process we must weigh the public interest served by the retroactive statute against the private interests that are overturned by it. *Adams Nursing Home of Williamstown, Inc. v. Mathews,* 548 F.2d 1077, 1080 (1st Cir. 1977). Implicit within this analysis is a consideration of the unfairness created by the retroactive legislation. *United States Trust Co. v. New Jersey,* 431 U.S. 1, 17 n.13 (1977) (quoting *Welch v. Henry,* 305 U.S. 134, 147 (1983), and citing *Turner Elkhorn,* 428 U.S. at 14–20) (stating that retroactive legislation may offend due process if it is "particularly 'harsh and oppressive' "). *See also* 2 SUTHERLAND STAT CONST sec. 41.06 (5th ed. 1993) ("Judicial attempts to explain whether such protection against retroactive interference will be extended disclose that elementary considerations of fairness and justice govern the decision").[8]

---

[8] For examples of decisions in which this sort of balancing test has been utilized, *see Chappy v. LIRC,* 136 Wis. 2d at 192–94 (weighing the need to ameliorate the affects of inflation on employees by imposing the inflationary costs on the employers against the de minimis effect of the retroactive law on the

We begin by examining the public interest served by the cap on noneconomic damages. Dr. Richards and the Fund argue that the damage cap was necessary to meet an important social problem: the medical malpractice crisis. They state, "[t]hrough ch. 655, the legislature has limited recovery for noneconomic damages in order to ensure health care for all citizens, while at the same time guaranteeing recovery for those injured by medical malpractice." "Under ch. 655, . . . a successful medical malpractice plaintiff now may recover all of the proved economic damages, and noneconomic damages up to $1,000,000," whereas without the fund, "it is likely that a plaintiff would be able to collect only some percent of the judgment." Further, they contend that the cap was enacted like the rest of ch. 655, Stats., (originally enacted in 1975) in response to: (1) a sudden increase in the number of malpractice suits; (2) the size of the jury awards; (3) the size of malpractice insurance premiums; and (4) "impending" dangers including increased health care costs, defensive medical practices, and the possibility that doctors would curtail their practices. *See State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 508, 261 N.W.2d 434 (1978) (upholding the constitutionality of ch. 655, (1975), against an equal protection and due process challenge). *See also* Laws of 1975, ch. 37 sec. 1 (legislative findings regarding medical malpractice).

employers); *State ex rel. Briggs & Stratton v. Noll,* 100 Wis. 2d at 656–58 (weighing the retroactive aspect's effect on the right to contract against the legislature's need to retroactively off-set the late adoption of a law); *Usery,* 428 U.S. at 16–20 (weighing the cost to employers of compensating for former employees' death or disability against the need to compensate former employees for injuries incurred while working in the coal mines).

In applying the cap retroactively here, the legislature has impaired the right to recover for the most severely injured malpractice victims in an effort (Dr. Richards and the Fund argue) to combat the increasing medical malpractice actions and awards and the resulting increased medical malpractice costs. We have seen these arguments raised in other forums and the media; however, in this court these assertions are supported by a paucity of evidence. To the contrary, the evidence supports the assertion that retroactive application of the cap does little, if any, to combat such problems. The monetary benefit from retroactively applying a cap of $1,000,000 will be too insignificant or nonexistent to have an affect upon medical malpractice costs – the express purpose of this legislation. First, evidence indicates that few individuals receive noneconomic damages in excess of $1,000,000. In fact, the U.S. Department of Justice Tort Policy Working Group found that only 2.7 percent of all medical malpractice claimants receive noneconomic damages in excess of $100,000. *See Report of the Tort Policy Working Group on the Causes, Extent and Policy Implications of the Current Crisis in Insurance Availability and Affordability,* U.S. Dept. of Justice, at 66, February 1986. Further, in those medical malpractice cases going to verdict where noneconomic damages above $100,000 are awarded, the noneconomic damages award averages between $428,000 – $728,000. *Id. See also* Gary J. Highland, *California's Medical Injury Compensation Reform Act: An Equal Protection Challenge,* 52 S. Cal. L. Rev. 829, 951 n.745 (recognizing that nationally, fewer than 1 percent of all awards in 1970 exceeded $100,000); *Carson v. Maurer,* 424 A.2d 825, 836 (N.H. 1980) (noting as significant the fact that " 'few individuals suffer non-economic damages in

excess of $250,000' [the legislative cap in New Hampshire]" (citation omitted)). Acknowledging that few individuals receive damages in excess of $1,000,000, we can safely assume that the number of persons retroactively affected by the law whose jury awarded noneconomic damages exceed $1,000,000 is too insignificant to have an affect on future malpractice costs.

Second, the statutory scheme in ch. 655, Stats., causes the retroactive application of the cap to have little effect in lowering malpractice insurance costs or in making medical malpractice insurance more accessible to health care providers. Section 655.27 limits the liability of health care providers and their malpractice insurers to $200,000 per occurrence, and $600,000 for all occurrences in one policy year, for occurrences before July 1, 1987.[9] Damages in excess of those amounts are paid by the Fund. Accordingly, malpractice insurance premiums which we can assume are based, at least in part, upon the risk of future acts of malpractice, would be based upon the risk that an award for one act of malpractice would range from $0 – $200,000 or the risk that the total of all awards for malpractice would range from $0 –$600,000. Therefore, retroactive application of a cap on noneconomic damages over $1,000,000 has no conceivable affect on insurance premiums when there is no risk to an

---

[9] *See* sec. 655.23(4), Stats., (requiring that health care providers carry $200,000 of insurance for each occurrence, and $600,000 for all occurrences in any one policy year before July 1, 1987; $300,000 of insurance for each occurrence, and $900,000 for all occurrences in any one policy year after July 1, 1987 and before July 1, 1988 and; $400,000 for each occurrence, and $1,000,000 for all occurrences in any one policy year, on or after July 1, 1988).

insurer of incurring liability over $200,000 or $600,000 respectively.

Finally, Dr. Richards and the Fund argue that the cap should be applied here because in the end, it actually serves the victims of medical malpractice. It does so, they argue, by ensuring that victims receive all of their economic damages and up to $1,000,000 of their noneconomic damages. Prior to the cap, they argue, victims were limited to the amount of insurance carried by the individual health care provider. This is an argument for the existence of the Fund, which is not at issue here. If the gist of Dr. Richards' and the Fund's argument is that retroactive application of a damage cap will help preserve the Fund coffers for future victims, we find it unpersuasive. As we stated earlier, evidence indicates that the number of noneconomic damage awards over $1,000,000 which accrued prior to the cap is too insignificant to have any impact on the Fund's coffers.

In sum, it appears to us that the retroactive application of the legislation does little, if anything, to further the purposes cited by Dr. Richards and the Fund. Like Dr. Richards and the Fund, we too are familiar with the generic reasons which are often cited for caps on noneconomic damages. However, as stated above, there is little if any evidence in this record to support those assertions.

We turn now to a consideration of the private interests affected by this retroactive legislation. The Martins argue that they have a vested property right in their cause of action to recover an unlimited amount of damages. They base their argument upon *Hunter,* 97 Wis. 2d at 441, in which this court concluded that an amended statute of limitations could not work to bar a plaintiff's cause of action for negligence which accrued

prior to the statutory amendment. The court in *Hunter* reasoned that the plaintiff had a vested right in a cause of action for negligence and that retroactive application of the amended statute of limitation would "have the effect of destroying or terminating that right." *Id.* at 447.

Dr. Richards and the Fund do not dispute that the Martins have a vested property right in their cause of action. However, they contend that the Martins have never had a vested right to a particular measure of damages, citing *Duke Power Co. v. Carolina Env. Study Group,* 438 U.S. 59, 88 n.32 (1978) (" 'A person has no property, no vested interest, in any rule of the common law' "); *Powers v. Allstate Ins. Co.,* 10 Wis. 2d 78, 88–92, 102 N.W.2d 393 (1960) (concluding that a circuit court has the right to reduce excessive damage awards), and therefore the legislature, at will, can limit the amount of noneconomic damages they may recover.

We disagree with Dr. Richards and the Fund that the Martins never had a right, vested or otherwise, to a particular measure of damages. The Martins, at the time of the injury, had a substantive right[10] to unlimited damages given to them by statute. In 1985 when the Martins' rights accrued, chapter 655, Stats., (to which the Martins were presumed to be bound, *see* sec. 655.005) implicitly provided the Martins with that right.

Wisconsin law provides that the amount of recovery, when set by a statute is fixed on the date of injury, *see State ex rel. Briggs & Stratton,* 100 Wis. 2d at

---

[10] Statutory modifications in damage limitations are changes in substantive rights. *Bradley v. Knutson,* 62 Wis. 2d 432, 436, 215 N.W.2d 369 (1974). We need not determine whether such right be considered "vested."

655–56 (holding that the right to recover a particular measure of damages in a worker's compensation case is fixed as of the date of injury); *Bradley v. Knutson,* 62 Wis. 2d at 436–37 (holding that in a wrongful death action, the date of injury determines the tortfeasor's liability. " '[R]ights growing out of a wrong must relate to the happening of the wrong itself.' ") (citation omitted), and may not be amended unless necessary for an important public purpose. *See State ex rel. Briggs & Stratton,* 100 Wis. 2d at 658 (holding that the fixed measure of damages may not be retroactively amended simply for the purpose of off-setting the late adoption of a law).

The right to unlimited damages was implicit within ch. 655, Stats., (1986), at the time the Martins' claim accrued. For example, sec. 655.04(1)(a) implicitly recognized the right to recover an unlimited amount of damages by both the reference to the right to recover over $25,000 and by the silence with regard to any limit on damages above that amount. The powers granted to the patient's compensation panels in sec. 655.065(4)(a) also implicitly recognized the panels' powers to award unlimited damages by not setting a limit on the possible award: "If the panel determines that a claimant has suffered bodily injury . . . the panel shall award compensation and benefits." Finally, the compensatory scheme in sec. 655.27 for Fund disbursements expressly recognized the right to recover over $1,000,000 in damages. Section 655.23(4) required health care providers to carry insurance of $200,000 per occurrence and $600,000 for all occurrences in one policy year prior to July 1, 1987, and sec. 655.27(1) provided that any claims in excess of these amounts would be provided by the Patients Compensation Fund. Section 655.27(5)(d), evinces that this excess is

unlimited providing that in the event any one claim exceeded $1,000,000, the Fund would pay the claim in increments of $500,000 per year until the claim had been paid in full.

The legislative history of ch. 655, Stats., reinforces the existence of the right to unlimited damages in 1985. The drafting record of 1975 A.B. 725 (which created ch. 655), contains early drafts of the Assembly Bill and subsequent Senate Amendments and Substitutions. Several of these drafts proposed limits on damage awards in medical malpractice actions of $100,000 to $500,000. However, ch. 655, as enacted in 1975, contained no such general damage limitation. Chapter 655 contained only a conditional limitation in sec. 655.27(6) which read:

> If, at any time after July 1, 1979, the commissioner finds that the amount of money in the fund has fallen below a $2,500,000 level in any one year or below a $6,000,000 level for any 2 consecutive years, an automatic limitation on awards of $500,000 for any one injury or death on account of malpractice shall take effect. This subsection does not apply to injury or death resulting from an incident of malpractice which occurred prior to the date on which such an award limitation takes effect. This subsection does not apply to any payments for medical expenses.

Therefore, in 1975, the right to damages was unlimited providing the Fund maintained a certain minimum level. In 1985, at the time the Martins' claim for damages accrued, that provision in sec. 655.27(6) was absent from ch. 655 leaving damages in medical malpractice cases unconditionally unlimited. In 1985 when the Martins' claim accrued, they had a substantive

right to recover, in full, the noneconomic damages awarded by the jury.

If applied, the cap on damages would retroactively impair that right. If the cap on damages were applied, the Martins would lose $1,150,000 – over half of their recovery. This is a severe impairment of their rights. The loss of noneconomic damages in any amount, however, is significant because noneconomic damages are essential to a tort victim. The court in *Carson,* 424 A.2d at 837, aptly described the importance:

> [A] tort victim 'gains nothing' from the jury's award for economic loss, since that money merely replaces that which he has actually lost. It is only the award above the out-of-pocket loss that is available to compensate in some way for the pain, suffering, physical impairment or disfigurement that the victim must endure until death.

Our analysis also requires that we examine the fairness of the retroactive taking. We believe the manner in which the Martins' rights would be impaired by the cap is inherently unfair for two reasons.

The cap was published one day and it became law the next. Without any meaningful notice, the Martins were stripped of their right to unlimited damages because they did not file on June 13, 1986, the day before the announced cap became effective, and because the time to file their claim fell within the four and one half year period between June 14, 1986, and January 1, 1991. If the Martins had been given adequate notice they could have filed earlier; if Ms. Martin's injuries accrued at a later date, the Martins could have waited to file until the cap sunsetted. Because they did neither, they were one of the few who

fell into the "trap for the unwary" presented by sec. 655.017, Stats.

There is yet one more measure of unfairness that the cap extracts, not just to the Martins but to all people whose noneconomic damages exceed one million dollars. The underlying assertion of the defendants, and of all who seek to impose a cap, is that the tort system is "broke" or at least badly in need of repair. Assuming the truth of that assertion for the sake of argument, the cap imposed here seeks to fix that system at the sole expense of those most seriously injured. That strikes us as neither fair nor equitable. A person whose noneconomic damages is one million dollars or less recovers 100 percent of his or her noneconomic loss. Those whose injuries exceed the cap receive but a fraction.

No one here asserts that the award here was not supported by the injuries. The injuries to Ms. Martin were and continue to be severe. She is today a partial spastic quadriplegic. Her hospitalization was long and traumatic. She can understand what is said to her, but cannot respond beyond "uh-huh" or "um hum." She can eat and drink, but only if someone cuts her food into small pieces and remains with her; she can barely swallow and the danger of choking is always present. She can walk, but for no more than 20 or 30 yards with the help of a cane. She is, in short, severely and permanently handicapped. Yet she is forced to pay for fixing the system while others whose injuries are less severe pay nothing. This hardly befits notions of fundamental fairness.

Having considered the loss of rights incurred by the Martins and the unfair manner in which that loss was occasioned, we must engage in the due process analysis recited earlier to determine whether the retro-

active application of the cap is constitutional. To restate that analysis, we must balance the public interest served by the retroactive application of the cap against the private interests that are overturned by it, including any unfairness inherent in such application.

As we concluded earlier, the record reveals minimal, if any, public interest served by applying the cap on noneconomic damages retroactively to limit the recovery of tort victims whose noneconomic damages exceed $1,000,000. There is little evidence before us to support the assertion that the retroactive application of the cap lowers medical malpractice costs or ensures health care in the future. In contrast, the Martins' right to unlimited damages was a fixed, substantive right. If the cap is applied to the Martins the impairment of their right will be severe: the Martins will lose $1,150,000 of their noneconomic damages. Further, they will have had no meaningful notice of such impairment. And, because of the seriousness nature of their injuries, they will be forced to help pay for "fixing" the system, while others less severely injured will not. The taking is substantial; the unfairness is palpable.

Accordingly, when we balance the public interest against the private interest affected here, keeping in mind basic considerations of fairness, we conclude that the private interest outweighs the minimal public interest served by the retroactive application of the cap. A jury of 12 lay citizens – not judges or lawyers – determined that the Martins had suffered a significant amount of noneconomic damages. Specifically, the jury awarded $2,000,000 for Ms. Martin's pain and suffering and $150,000 for the Martins' past loss of society and companionship. The cap not only deprives the Martins of over half of their recovery, or $1,150,000, it affects only litigants like the Martins whose damages

are so severe as to exceed $1,000,000. In an attempt to further the few purposes cited for retroactive application of the cap, the legislature has placed the burden on the most severely injured litigants, whose claims accrued before the cap was enacted. To deprive the Martins and litigants like them of their recovery in the ephemeral hope that this retroactive application will further the few purposes cited for the retroactive application of the cap, violates the most fundamental notions of fairness and strikes at the heart of due process.

Accordingly, we hold that retroactive application of the cap on noneconomic damages in sec. 655.017, Stats., would be unconstitutional under the Due Process Clause of the United States and Wisconsin Constitutions.

## CONCLUSION

In sum, we conclude: (1) that the jury's decision on informed consent should stand and accordingly, we affirm the court of appeals; (2) that the failure of the verdict to contain a question on cause with respect to the issue of informed consent was not fatally defective because such a question was waived by the parties, and accordingly, we reverse the court of appeals; (3) that the circuit court was correct in determining that sec. 448.30, Stats., was inapplicable to Dr. Hansen and accordingly, we reverse the court of appeals; and (4) that the cap on noneconomic damages should not be retroactively applied.

*By the Court.*—The decision of the court of appeals is affirmed and reversed.