Kimberly Schreiber, a minor by her Guardian ad Litem, John Krueger; Gerald Schreiber and Janice Schreiber, Plaintiffs-Appellants,

v.

Physicians Insurance Company of Wisconsin; Paul K.H. Figge, Jr., M.D.; Wisconsin Patients Compensation Fund, Defendants-Respondents,†

State of Wisconsin and Employers Health Insurance Company, Defendants.

Court of Appeals

*No. 96–3676. Oral argument October 16, 1997.—Decided February 17, 1998.*

(Also reported in 579 N.W.2d 730.)

†Petition to review granted.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of and orally argued by *D. J. Weis* of *Habush, Habush, Davis & Rottier, S.C.* of Rhinelander.

■■■■■■■■■■

■■■■■

On behalf of the defendants-respondents, the cause was submitted on the brief of and orally argued by *Susan R. Tyndall* of *Hinshaw & Culbertson* of Milwaukee.

Before Cane, P.J., Myse and Hoover, JJ.

CANE, P. J. Kimberly Schreiber and her parents, Janice and Gerald Schreiber, appeal from a judgment dismissing their claim that Dr. Paul K. H. Figge, Jr., violated Janice's right to informed consent. The Schreibers contend the trial court erred by concluding that Janice was not entitled to choose a cesarean section in the midst of childbirth, and by holding that Figge had no duty to either inform Janice of changes that occurred during labor or to obtain her consent to vaginal delivery after those changes occurred. We conclude that under the specific facts of this case Figge violated his duty under the informed consent statute by refusing to comply with Janice's request for a cesarean. We therefore reverse the judgment and remand the matter to the trial court for a determination of damages.

It is helpful to state at the outset what this case is and is not about. This is not a case establishing a right to treatment on demand. This is also not a case in which the doctor is ethically opposed to a requested treatment, nor is it a case in which the requested treatment falls outside the doctor's practice and experience. Rather, this case involves a doctor who ignores a patient's choice between two medically viable treatment options.

The trial court's findings of fact are substantially undisputed.[1] Prior to the labor that lies at the heart of

---

[1] This case was tried to the court without a jury.

this case, Janice had two children by cesarean. The first cesarean was performed because of insufficient progress seventeen hours after Janice went into labor. The second cesarean was performed because it was then standard medical procedure to do elective repeat cesarean births. Figge performed both of these procedures.

When Janice became pregnant with Kimberly it was becoming more medically acceptable to attempt a vaginal birth after cesarean (VBAC). Janice met with Figge to discuss the alternatives and, after being given a choice between a cesarean and a VBAC, elected the VBAC. Figge testified at trial that he told Janice that her vaginal delivery would be treated like any other labor, and that a cesarean would be performed if medically indicated.

Janice began labor and was admitted to the hospital shortly after 4 a.m. Figge first saw her at about 8 a.m., and at that time Janice told him that she had changed her mind and wanted a cesarean. Figge did not grant her request. At about 8:30 a.m., Figge concluded that Janice's VBAC delivery was not progressing as fast as he would like and he therefore performed an amniotomy, the breaking of the mother's amniotic fluid sac. Janice thereafter began to experience severe upper abdominal pain unlike any she had felt in her prior deliveries, and that she did not associate with her contractions. She was given pain medication throughout the remainder of her labor with limited success.

At 1 p.m. Figge returned to Janice's room to examine her. He concluded that she was making insufficient progress in labor, and tried but failed to discern the cause of her pain. Although Figge felt he could not completely rule out two potentially harmful causes of

98

the pain, uterine rupture or placental separation,[2] he concluded from his examination that the pain did not indicate any impending danger to the mother or child. In arriving at this assessment, Figge also relied on the fact that in his experience at least one or two patients a year similarly suffered from undiagnosed pain, and that such pain always resolved itself on the baby's birth.

At about this time Janice made her second request for a cesarean, and Figge responded that he wanted to give the labor some additional time. Janice complained to Figge about her pain, and again requested a cesarean. Figge responded something to the effect that if he "gave every woman who was in labor who asked for one a section, they'd all do it." Janice felt intimidated by Figge's abrupt attitude, and further that they were not "on the same team." In her weakened condition Janice did not pursue the matter further.

Figge testified that while he knew that Janice was experiencing abdominal discomfort and irregular contractions, and while he felt that Janice would have chosen a cesarean if given the choice,[3] he did not grant her request because he felt that a cesarean was not

---

[2] This occurs when the placenta detaches from the uterine wall.

[3] The trial transcript reads:

Q. And you encouraged her to continue on with the trial of labor at that point?

A. I explained to her what I thought the situation was and what we could do to further ascertain information regarding that, and I did not think that it was unsafe to proceed.

Q. You fully recognized at the time that you had that conversation with her from what you could tell of her demeanor and where she was at in this process that had she—had you given her the choice of going to a cesarean or to continue on with a vaginal delivery that she would have opted for the cesarean, correct?

medically indicated at the time. Figge also testified, however, that he would have performed the procedure if Janice had persisted in requesting it.

About 2 p.m. it became clear to Figge that Janice was in a "hypotonic" pattern, which meant that she was not going to make progress with labor. Figge testified that there were two alternatives at this time: to correct the problem with Pitocin, a labor-inducing drug, or perform a cesarean. Although the Schreibers had recently requested a cesarean, Figge encouraged them to hang on, and testified that he believed they acquiesced in his decision because they stopped resisting his recommendation to wait.

Janice was then given Pitocin to stimulate the labor process. Pitocin was administered in increasing amounts until 3:40 p.m., when the fetal heart beat dropped. Shortly after 4 p.m. an emergency cesarean was performed, and Kimberly was born a spastic quadriplegic. It is stipulated that had Kimberly been born by cesarean prior to 3:29 p.m. she would have been born healthy and normal.

The Schreibers' initial claim against Figge alleged both medical malpractice and a violation of the informed consent statute. Prior to trial, however, the Schreibers dropped their medical malpractice claim. Our inquiry on appeal therefore does not concern whether Figge's treatment was appropriate, but only whether the Schreibers have a successful claim under the informed consent statute.

---

A. Being in labor, being uncomfortable, she would have done it just simply because of discomfort.

Q. In any event, it was apparent to you that she would have done so?

A. That's correct.

100

The trial court found that Janice had given her informed consent to the VBAC prior to labor, a finding not challenged on appeal. The court also concluded that Figge had no duty to obtain a new informed consent during labor. The court determined that such a duty would only arise if the medical situation changed in such a way as to increase the risks involved. While acknowledging that a cesarean was medically viable at the time Janice requested one, the court determined that there was no change in the situation sufficient to trigger a new duty to obtain Janice's informed consent.

For purposes of appeal, the trial court addressed additional questions that its judgment otherwise made unnecessary. First, the trial court found that Janice was denied a choice among treatments that afternoon. The court noted that Janice's "consent was not solicited and it was not obtained." Further, the court found that Janice would have opted for a cesarean that afternoon if Figge had given her a choice. The court believed that Janice's failure to pursue it because of her stress, discomfort, and perception that Figge's attitude was brusque was entirely credible. Second, the court found that the Schreibers had not established any causation between an assumed informed consent violation and subsequent damages. The trial court then dismissed the Schreibers' claims. The Schreibers appeal.

The Schreibers contend that they were denied the right to informed consent when Janice's requests for a cesarean were refused. They claim that under the informed consent statute Figge was not permitted to ignore Janice's clear request for a change in medically viable treatments.[4] Figge responds that he met his informed consent obligations because Janice initially

---

[4] In the alternative, the Schreibers argue that Figge at least had a duty to either provide additional information or to clearly

chose the VBAC procedure and never actually withdrew her consent to that procedure, and further argues that a cesarean was not a medically viable alternative when Janice requested it.

■

Our standard of review in this case is straightforward: the trial court's factual findings are reviewed under a clearly erroneous standard, and we will give due regard to that court's ability to assess witness credibility. Section 805.17(2), STATS. Such factual findings will be upheld as long as they are supported by any credible evidence or reasonable inferences that can be drawn therefrom. *Estate of Cavanaugh v. Andrade*, 202 Wis. 2d 290, 306, 550 N.W.2d 103, 110 (1996). The trial court's conclusions of law, however, are entitled to no deference, and are reviewed by this court under a de novo standard. *Ball v. District No. 4 Area Bd.*, 117 Wis. 2d 529, 537, 345 N.W.2d 389, 394 (1984).

■

The Wisconsin informed consent law states:

> Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physician's duty to inform the patient under this section does not require disclosure of:
>
> (1)  Information beyond what a reasonably well-qualified physician in a similar medical classification would know.
>
> (2)  Detailed technical information that in all probability a patient would not understand.

offer her a choice. Our conclusion that Figge could not refuse Janice's request makes resolution of these issues unnecessary.

(3)   Risks apparent or known to the patient.

(4)   Extremely remote possibilities that might falsely or detrimentally alarm the patient.

(5)   Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.

(6)   Information in cases where the patient is incapable of consenting.

Section 448.30, STATS. This statute imposes on physicians, before they subject their patients to medical treatment, the duty to explain all alternate, viable procedures to the patients and to warn them of any material risks or dangers inherent in or collateral to the proposed treatment. This is required to enable the patient to make an intelligent and informed choice about whether to follow the physician's recommendation or to select some other medically acceptable treatment alternative. *Martin v. Richards*, 192 Wis. 2d 156, 173–74, 531 N.W.2d 70, 78 (1995) (citing *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 12–13, 227 N.W.2d 647, 653–54 (1975)).[5]

Where there are two or more medically acceptable treatment approaches to a particular medical problem, the informed consent doctrine, medical ethics, and the standard of care all provide that a competent patient has the absolute right to select from among these treatment options after being informed of the relative risks and benefits of each approach. Basic to the informed consent doctrine is that a physician has a legal, ethical and moral duty to respect patient autonomy and to

---

[5] In 1981, the Wisconsin legislature codified the Scaria standard, *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 227 N.W.2d 647 (1975), in § 448.30, STATS. *See* Laws of 1981, ch. 375, § 2 (effective May 7, 1982).

provide only authorized medical treatment. *See Martin*, 192 Wis. 2d at 169, 531 N.W.2d at 76; *see also In re Guardianship of L.W.*, 167 Wis. 2d 53, 68, 482 N.W.2d 60, 65 (1992) (recognizing right to self-determination). The corollary to this principle is that it is inappropriate for physicians to pursue a treatment alternative other than the one to which their patient has given consent. This means that unless the patient consents to the physician's recommended treatment approach, the physician may not proceed with that approach even if the physician personally believes the recommended approach to be in the patient's best interests.[6] *See Bankert v. United States*, 937 F.Supp. 1169, 1173 (D. Md. 1996).

The doctrine of informed consent "stems from the fundamental notion of the right to bodily integrity: '[e]very human being of adult years and sound mind has a right to determine what shall be done with his [or her] own body.'" *Martin*, 192 Wis. 2d at 156, 531 N.W.2d at 76 (quoting *Schloendorff v. Society of New York Hosp.*, 105 N.E. 92, 93 (N.Y. 1914), *overruled on other grounds by Bing v. Thunig*, 143 N.E.2d 3 (N.Y.

---

[6] The dissent suggests this opinion compels a doctor to undertake a course of treatment the doctor believes is medically inadvisable. We are reluctant to enter into a debate as to whether Figge believed it was medically inadvisable to perform a cesarean. It is our opinion that under the informed consent doctrine, a doctor's personal belief as to the best approach cannot outweigh the patient's right to select a medically viable treatment. In any event, our reading of his testimony is that Figge was willing to perform a cesarean only if he felt it would be safer than continuing with labor. He felt it was his "obligation to try and deliver her safely vaginally" unless something occurred to indicate that it would be safer to perform a cesarean. However, at no time did he state that it would have been medically inadvisable to perform the cesarean.

1957)). The Wisconsin informed consent statute seeks to achieve this goal of patient autonomy by insuring the patient has sufficient information to allow for a meaningful choice among medically viable treatments. *Id.* at 174–75, 531 N.W.2d at 78 (the doctor must provide information "reasonably necessary for a patient to intelligently exercise his or her *choice* regarding medical treatment.") (Emphasis added.)

The deference *Martin* pays to the patient's right to choose her or his treatment is important because it demonstrates that the informed consent statute protects more than merely the patient's right to obtain information. It would be an absurd result indeed if we were to hold that a doctor could meet his or her obligations under the informed consent statute simply by providing information to the patient while ignoring the patient's ultimate choice.[7] Therefore, in addition to protecting the patient's right to obtain information, the informed consent statute must protect the patient's right to choose a medically viable treatment and have that choice respected by her or his doctor.

We further believe that this right to determine one's own treatment and have that choice respected applies regardless of when the choice is made. A competent patient's right to select from among medically acceptable treatment alternatives also encompasses the right to change one's mind about the treatment approach selected. "A competent patient who has had two prior cesarean sections has the right to consent or withhold consent to a trial of labor." *See generally Bankert*, 937 F.Supp. at 1174. There is nothing about

---

[7] "[I]t is a fundamental rule of statutory construction that any result that is absurd or unreasonable must be avoided." *State ex rel. Reimann v. Circuit Court for Dane County*, 214 Wis. 2d 604, 571 N.W.2d 385, 391 (1997).

pregnancy or the onset of the labor process that automatically renders a woman incapable of rational thought or unable to participate in competent decision-making with respect to which medically viable treatment will be followed.

The facts of this case reveal that Figge failed to respect Janice's right to choose her treatment. The trial court found that Janice at least three times requested a change in treatment; that the treatment sought was medically viable; that Janice's explanation for ceasing in her efforts to exercise her choice was "entirely credible"; and that Janice would have chosen a cesarean if Figge had offered her a choice. Under these circumstances Figge could not ignore Janice and substitute his own choice for hers.

■

The more difficult question for us is whether Janice's right to choose and control her treatment prevented Figge from refusing to perform the cesarean when she requested it. Keeping in mind that a cesarean remained a medically viable alternative, we conclude that under the specific facts of this case Figge could not refuse the request.[8] Figge had a duty to either perform the cesarean or to obtain Janice's consent to continue with the vaginal delivery when she requested the medically viable alternative treatment.

We do not believe our decision today will lead us, as Figge and the dissent suggest, toward the perceived dangers of a treatment on demand system. Nor does our decision raise any additional complexities in a doctor-patient relationship. To show this, it is helpful to

---

[8] We do not address whether Figge could have also met his informed consent duty under these circumstances by finding a doctor willing to perform the cesarean, because that argument was not raised.

106

again state what this case is not. First, this is not a case in which a doctor is ethically opposed to performing a certain medical treatment. Figge routinely performed cesareans as a part of his medical practice, including two specifically with Schreiber prior to this pregnancy. Further, Figge had initially given Janice the opportunity to elect a cesarean prior to labor, and testified that he would have performed one during labor if Janice had persisted in demanding one. Second, for the same reasons, this is not a case in which the requested medical treatment falls outside the doctor's practice and experience.

Instead, this is a case involving a patient who has been given a free choice by her doctor between two medically viable treatment options prior to labor, initially chooses one, but then changes her mind in the face of an unexpected change of circumstances that is inconsistent with or outside the patient's previous experience in similar circumstances. The doctor, although perfectly able and willing to follow the patient's wishes, and although the patient chose a medically viable alternative that had been offered to her by this doctor earlier, nonetheless ignored his patient and substituted his own choice for hers.

We also believe that another critical fact involved in this case sufficiently limits our holding: Janice was in labor at the time she made her request. As Figge points out in his brief, this is a "unique" case because labor involves a lengthy and painful process that the patient undergoes without a general anesthetic. Because of this critical fact, we must affirm Janice's right to choose a cesarean. First, Janice's labor obviously limited her ability to search for and find a doctor

willing to perform the requested treatment.[9] Second, Janice's labor and painful condition limited her ability to continually demand a change in treatment, as Figge expected her to do. Third, Janice could not be expected to expressly withdraw her consent to the VBAC until she could find a doctor willing to perform a cesarean. Therefore, we cannot conclude, as Figge suggests, that there was no informed consent violation in light of Janice's failure to clearly withdraw her consent to the VBAC. She practically could not do so until it became clear that Figge or another doctor would honor her request for a cesarean.

Figge offers three reasons why we should not hold that his refusal to abide by Janice's request violated her right to informed consent. First, he disputes the trial court's factual finding that a cesarean was a medically viable form of treatment when Janice requested it. We see little merit to this argument. Most importantly, Figge's view on appeal would directly contradict the parties' stipulation that Kimberly would have been born healthy and normal if the cesarean had been performed before 3:29 p.m. Furthermore, Figge's own testimony that he would have performed a cesarean if Janice had continued to demand the procedure indicates that the procedure remained a medically viable treatment option. Finally, because a cesarean was obviously viable at both ends of the timeline, at the beginning during the prenatal conference and again at the end when it was actually performed, it could reasonably be inferred that this treatment was also viable throughout the timeline. We therefore uphold the trial

[9] The record indicates that Janice's upper abdominal pain during labor was so severe at times that she could not get out of bed without assistance.

court's finding because it is supported by credible evidence.

Figge next argues that he was within his rights to make recommendations to Janice,[10] and that Janice appeared to acquiesce because she stopped making demands for a cesarean. We affirm the trial court's implicit finding that Janice did not acquiesce. The trial court found that Janice was not given a choice and, further, that if she had been given a choice she would have elected a cesarean. This finding is supported by credible evidence. As the trial court noted, Janice's failure to pursue the matter after making three requests was entirely credible in light of Figge's brusque demeanor and her considerable pain.

While we agree that a doctor can, and indeed should, make treatment recommendations, this responsibility cannot be substituted for providing the patient with a meaningful choice. A doctor should not be permitted to wear down a patient by continually advancing the doctor's position, nor should a doctor be permitted to stand behind an incapacitated patient's inability to surmount a brusque, dismissive demeanor. It is also important to recall that Figge avoided offering Janice a choice that afternoon even though it was apparent to him that she would have continued to ask for a cesarean.[11] On these facts we conclude that the trial court's implicit finding of no acquiescence is supported by credible evidence.

Figge's final argument is that even if he violated Janice's right to informed consent, there are no damages. In support of his argument, Figge refers us to

[10] See Martin v. Richards, 192 Wis. 2d 156, 181-82, 531 N.W.2d 70, 81 (1995).

[11] See note 3, supra.

both Wisconsin case law establishing an objective standard of causation in informed consent cases and the trial court's finding that a reasonable patient in Janice's position would not have elected a cesarean. We are not persuaded.

We begin by acknowledging that all Wisconsin informed consent cases addressing the causation issue have followed an objective test. *See, e.g., Scaria,* 68 Wis. 2d at 12, 227 N.W.2d at 654–55. We do not believe, however, that these cases control the outcome in this case because they addressed a question different from the one before us. Notably, all these prior informed consent cases focused on whether the information given to the patient was sufficient. When those cases concluded that the information given was insufficient, the court was required to determine whether that violation actually caused the damages complained of. In other words, as the *Martin* court explained, the question was then whether it "would have made a difference" if the patient was given the correct information. *Id.* at 182, 531 N.W.2d at 81.[12] We do not believe that such an inquiry is necessary in this case.

As we have noted, Wisconsin adheres to the "fundamental notion of the right to bodily integrity." *Id.* at 169, 531 N.W.2d at 76. We are unwilling to apply an objective standard in a case such as this where the patient clearly expressed her treatment choice, and where that choice was simply ignored. We are unwilling to allow a doctor to hide behind the question of what a "reasonable" patient would have done where the doctor fails to respect a patient's choice among medically

---

[12] This causation question is generally answered by a finding that a reasonable person would not have consented to the doctor's proposed treatment had the patient been fully informed of all available treatments. *See* WIS J I—CIVIL 1023.3.

110

viable treatment alternatives, and where that failure causes damages. Because the parties stipulated that Kimberly would have been born healthy and normal if Figge had not refused Janice's request that afternoon, we conclude that damages resulted from this breach of the informed consent statute.

■

We therefore conclude, on the specific facts before us, that Figge could not refuse Janice's request for a cesarean. His refusal to abide by Janice's fundamental right to choose her own method of treatment constitutes a violation of the Wisconsin informed consent statute, and damages flowed from that violation without regard to the "objective" standard of causation.

*By the Court.*—Judgment reversed and cause remanded for a hearing on damages.

MYSE, J. *(dissenting)*. I enthusiastically endorse the majority's discussion of the patient's right to determine her or his course of treatment. However, I respectfully dissent from the majority's holding that under certain circumstances a doctor can be compelled to undertake a course of treatment the doctor believes is medically inadvisable. This is not, and cannot be, the law. It is neither supported by the informed consent statute nor sensibly grounded in public policy.

The informed consent statute is as follows:

> Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physician's duty to inform the patient under this section does not require disclosure of:

111

(1) Information beyond what a reasonably well-qualified physician in a similar medical classification would know.

(2) Detailed technical information that in all probability a patient would not understand.

(3) Risks apparent or known to the patient.

(4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.

(5) Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.

(6) Information in cases where the patient is incapable of consenting.

Section 448.30, STATS. This statute codified the standard set forth in *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 227 N.W.2d 647 (1975). *See Martin v. Richards*, 192 Wis. 2d 156, 173–74, 531 N.W.2d 70, 78 (1995).

The Wisconsin informed consent statute cannot be fairly read to compel either Figge or any other doctor to perform a treatment the doctor does not believe is medically indicated. In interpreting a statute our goal is to ascertain the intent of the legislature. *UFE, Inc. v. LIRC*, 201 Wis. 2d 274, 281, 548 N.W.2d 57, 60 (1996). The first step of this process is to look at the language of the statute. *Id.* If the plain meaning of the statute is clear, we should simply apply that meaning to the facts before it. *Id.* at 281–82, 548 N.W.2d at 60.

The plain language of the informed consent statute merely requires the doctor to provide the patient with information sufficient to allow the patient to either consent or withhold consent to the doctor's proposed medical treatment. This much was said in *Scaria*. There the court stated:

> The right to be recognized and protected is the right of the patient to consent or not to consent to a proposed medical treatment or procedure.
>
> . . . .
>
> In short, the duty of the doctor is to make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to intelligently exercise his right to consent or to refuse the treatment or procedure proposed.

*Id.* at 12–13, 227 N.W.2d at 653–54. The plain language of the informed consent statute and *Scaria* demonstrate that there was no intent to require a doctor to perform medical treatment on demand. Figge should not be held liable for failing to do so here.

The majority attempts to create a right to treatment on demand in this case by relying on the fundamental notion of the right to bodily integrity. Quoting from *Martin*, the majority adopts the position that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his [or her] own body." This is rather ironic because the majority proceeds to compel a doctor to perform a treatment the doctor does not believe is medically indicated and does not want to do. In the instant case, Figge determined that "there was no real danger" as a result of Janice's upper abdominal pain, and therefore believed "that there was no real indication to proceed to a cesarean" when Janice requested it. Figge's refusal to perform the cesarean was based on his belief that it was bad medical practice to perform a cesarean based on complaints of pain alone. If his medical judgment concerning the appropriateness of a cesarean was incorrect, Figge may be liable in a medical malpractice

claim. But Figge's refusal to carry out a treatment that he believes is contraindicated does not implicate the informed consent statute.

The informed consent statute requires the doctor to explain all viable, medical modes of treatment. This recognizes that there may be a number of feasible approaches to a specific medical problem. But simply because a medical procedure is feasible does not make such a procedure preferable or even desirable. We have recognized this in several cases by reaffirming the doctor's right to make recommendations and even persuade the patient to follow the doctor's superior medical judgment. *See, e.g., Martin*, 192 Wis. 2d at 181, 531 N.W.2d at 81 ("The doctor might decide against the alternate treatments or care, [she or] he might try to persuade the patient against utilizing them, but [she or] he must inform them when a reasonable person would want to know."). Of course, the patient is entitled to know about and even to elect other medical procedures that are available but not recommended. I do not believe, however, that this right encompasses the right to compel a given doctor to perform a specific treatment. The doctor should retain the right to refuse to follow a course of treatment that contravenes the doctor's opinion as to proper medical practice and procedure.

Contrary to the Schreibers' argument, affirming this right of the doctor does not correspondingly render meaningless the right of the patient to direct her or his treatment. If a doctor refuses to follow the patient's choice of treatment the patient remains able to seek another doctor willing to accept the choice of treatment. While I acknowledge that under certain circumstances a patient may not be able to effectively choose among all treatment options, there is nothing in

114

the informed consent statute to suggest that a doctor must follow the patient's request in those cases. By refusing to include such a provision in the statute I believe the legislature intended to balance the doctor's right to control one's own medical practice with the patient's right to control one's own treatment.

I further believe that the majority decision is bad public policy. Such a decision can only work to raise additional complexities in an already complex system of legal entanglements with the patient-doctor relationship. By limiting its result to the facts, the majority gives little guidance to doctors with respect to this new duty. It is unclear when a doctor will have to follow a patient's demands for treatment, and the majority opinion establishes no criteria that will assist the doctor in making this determination. For all these reasons, I would hold that Figge violated no duty by refusing to perform the cesarean at the time it was requested.