Kimberly SCHREIBER, a minor by her Guardian ad Litem, John Krueger; Gerald Schreiber and Janice Schreiber, Plaintiffs-Appellants,

v.

PHYSICIANS INSURANCE COMPANY OF WISCONSIN; Paul K.H. Figge, Jr., M.D.; Wisconsin Patients Compensation Fund, Defendants-Respondents-Petitioners,†

STATE of Wisconsin and Employers Health Insurance Company, Defendants.

Supreme Court

*No. 96–3676. Oral argument October 7, 1998.—Decided January 26, 1999.*

(Also reported in 588 N.W.2d 26.)

†Motion for reconsideration filed by Wisconsin Patients Compensation Fund denied April 7, 1999.

For the defendants-respondents-petitioners there were briefs by *Susan R. Tyndall* and *Hinshaw & Culbertson*, Milwaukee and oral argument by *Susan R Tyndall*.

For the plaintiffs-appellants there was a brief by *D.J. Weis* and *Habush, Habush, Davis & Rottier, S.C.*, Rhinelander and oral argument by *D.J. Weiss*.

Amicus curiae brief was filed by *Lynn R. Laufenberg* and *Cannon & Dunphy, S.C.*, Brookfield for the Wisconsin Academy of Trial Lawyers.

¶ 1. ANN WALSH BRADLEY, J. The defendants, Physicians Insurance Company of Wisconsin (Physicians Insurance), Dr. Paul K.H. Figge, Jr., and Wisconsin Patients Compensation Fund, seek review of a published decision of the court of appeals that reversed the circuit court's dismissal of a suit brought by the plaintiffs Kimberly Schreiber and her parents, Janice and Gerald Schreiber.[1] They allege that Figge violated Janice's right to informed consent by failing to again conduct an informed consent discussion after Janice withdrew her consent to a vaginal delivery while in labor.[2] Because we determine that during her labor Janice withdrew her consent to a vaginal delivery and that at the time of her withdrawal there existed medically viable options for treatment, we conclude that her withdrawal constitutes a substantial change in circumstances requiring a new informed consent discussion. Additionally, we determine that a subjective test should be applied to the question of whether Figge's failure to conduct another informed consent discussion was a cause of the Schreibers' injuries. Accordingly, we affirm the court of appeals.

¶ 2. The relevant facts are essentially undisputed. This action stems from Janice Schreiber's labor

---

[1] *Schreiber v. Physicians Ins. Co.*, 217 Wis. 2d 94, 579 N.W.2d 730 (Ct. App. 1998) (reversing judgment of Circuit Court for Oneida County, James W. Karch, Reserve Judge).

[2] Informed consent is codified at Wis. Stat. § 448.30 (1995–96). Unless otherwise noted, all further references to the Wisconsin Statutes will be to the 1995–96 version. .

and delivery of Kimberly Schreiber at Saint Mary's Hospital in Rhinelander, Wisconsin. This was Janice's third pregnancy. Figge served as Janice's obstetrician in all three of her pregnancies and delivered all three of her children. Her first two children were delivered by way of cesarean sections. Figge performed the first cesarean delivery in 1981 because after over 17 hours of labor Janice still had not progressed to a point where a vaginal delivery was possible. At the time of Janice's second delivery in 1984, the prevailing medical practice followed the "once a cesarean always a cesarean" rule. As a result, Janice had her second child by cesarean delivery.

¶ 3.   By the time of her pregnancy with Kimberly in 1987, the prevailing medical research and practice suggested that having a vaginal birth after cesarean (VBAC) was no more dangerous than having another cesarean delivery. In some circumstances a VBAC presented less risk to the health of both the mother and child than did another cesarean delivery. In the course of Janice's prenatal care she and Figge discussed a VBAC delivery as an alternative to another cesarean delivery. Figge recommended attempting the VBAC and Janice agreed to that course of treatment. Janice testified at trial that she was under the impression that she would first attempt the VBAC but could change her mind during labor and instead have another cesarean delivery. Figge testified that he understood Janice's pre-labor choice of the VBAC to be decisive, meaning that once her labor began Kimberly would be delivered vaginally unless and until Janice's symptoms medically warranted a cesarean section.

¶ 4.   As her delivery neared, Janice went into labor and was admitted into the hospital at approximately 4:00 a.m. Janice signed consent forms for both a

VBAC and cesarean delivery as part of her hospital admission. Figge first visited Janice's hospital room at 8:00 a.m. to see how her labor was progressing. At that 8:00 a.m. visit Janice told Figge that she had changed her mind and wanted to abandon her plan for a VBAC and instead have another cesarean delivery. Figge urged Janice to continue with the VBAC. At approximately 8:30 a.m., Figge concluded that Janice's labor was not progressing as he had hoped. He then manually broke Janice's amniotic fluid sac in an effort to speed up the labor. Janice thereafter began experiencing excruciating abdominal pains sharply different from her contractions and unlike anything she had experienced with her prior deliveries. Nurses attempted unsuccessfully to ease the pain with various medicines. The pain was so unbearable that at one point Janice sent her husband to locate their nurse so that the nurse would again relay to Figge Janice's desire for a cesarean delivery.

¶ 5. Figge next checked on Janice at approximately 1:00 p.m. Again Janice complained of the abdominal pain. Figge attempted to diagnose the source of the pain but could not determine conclusively that it was caused by either a uterine rupture or separation of the placenta from the wall of the uterus. Figge concluded that the abdominal pains did not pose a danger to either Janice or Kimberly. He based this diagnosis primarily on his experience of seeing other women in labor suffer from similar abdominal pains that disappeared after delivery.

¶ 6. Also at this 1:00 p.m. visit Janice again informed Figge that she wished to cease the VBAC and instead have another cesarean delivery. Figge again instructed Janice to remain patient because he wanted to give the VBAC more time. When Janice protested,

again complained of the pain, and again requested a cesarean delivery, Figge tersely responded to the effect that if he performed a cesarean delivery on every woman who wanted one that all deliveries would be by cesarean section.

¶ 7. Janice later testified at trial that she was upset and intimidated by Figge's comment. As a result, she did not again bring the issue of ceasing the VBAC to Figge's attention. Figge later testified that he sensed no barrier between Janice and himself from that conversation. He further testified that at the 1:00 p.m. visit he knew that Janice would have preferred to have a cesarean delivery but that he thought the better course of treatment was to continue with the VBAC. Figge also testified that he would have acquiesced if Janice had further persisted in her requests for a cesarean delivery.

¶ 8. Janice's labor still did not progress as Figge would have liked. At 2:00 p.m. Figge again visited Janice's room to check on her condition. Figge again counseled Janice against the cesarean delivery and continued to advocate for continuing with the VBAC. After Figge's earlier terse statement, Janice did not reiterate her desire for a cesarean section. Figge interpreted her silence as her concurrence in continuing with the VBAC.

¶ 9. At 3:40 p.m. Kimberly's heart rate dropped. Figge was summoned and performed an emergency cesarean section at just after 4:00 p.m. It was too late. Janice's uterus had ruptured depriving Kimberly of oxygen. Kimberly was born a spastic quadriplegic and she cannot move below her neck or speak. The parties have stipulated that had Kimberly been delivered prior to 3:29 p.m. she would have been born a healthy child.

¶ 10. The Schreibers sued Figge and his insurer, alleging both that Figge was negligent in his misdiagnosis of Janice's abdominal pain and that he violated Janice's informed consent rights. At some point in the litigation the Schreibers dropped their medical malpractice claim and proceeded to trial solely on the informed consent cause of action.

¶ 11. After a trial to the court, the circuit court found that Janice made an informed consent to the VBAC prior to the beginning of her labor. The circuit court also found that by the 8:00 a.m. meeting, Janice would have opted to discontinue the VBAC and instead have another cesarean delivery if Figge had offered her the choice. Although she repeatedly communicated this preference to Figge, he did not comply with her request. He knew the cesarean delivery was a viable medical option but did not consider it to be medically indicated. The circuit court held that Figge's duty was to manage Janice's labor in a way that would safely achieve the goal of delivery by VBAC upon the onset of labor.

¶ 12. The circuit court further concluded that Figge was under no obligation to re-advise Janice of her medical options or seek new consent when her labor did not progress as planned. The court reasoned that a doctor would only need to re-obtain consent when there was a substantial medical change in circumstances so that the patient faced risks unconsidered when the original consent was given. The court determined that the risks Janice faced when her labor did not progress were no different than the risks she was made aware of when she originally gave her consent. The circuit court concluded that there was no substantial change in circumstances and dismissed the Schreibers' case.

¶ 13. The Schreibers appealed and contended that Janice's statements to Figge that she no longer wanted to continue with the VBAC were a withdrawal of her consent which triggered Figge's duty to have a new informed consent discussion. A divided court of appeals reversed the circuit court and concluded that where two or more medically acceptable options for treatment are present, the "competent patient has the absolute right to select from among [those] treatment options after being informed of the relative risks and benefits of each approach." *Schreiber v. Physicians Ins. Co.*, 217 Wis. 2d 94, 103, 579 N.W.2d 730 (Ct. App. 1998). It grounded its holding both in the informed consent statute and the common law right of bodily integrity from which the statute is derived. *Id.* at 103–04. The court of appeals determined that in order for the doctrine of informed consent to be effective, it must require a physician to do more than outline the methods of treatment available to a patient. Informed consent must also bind the physician to follow the course of treatment chosen by the patient so long as that chosen treatment is medically viable. *Id.* at 105.

¶ 14. The court of appeals reasoned that both the VBAC and cesarean delivery were viable medical options from the beginning of labor. Janice at first chose the VBAC. Some time into her labor she changed her mind and chose a cesarean delivery. Thus, the court of appeals concluded that Figge violated Janice's informed consent right by refusing to follow her clearly communicated choice of treatment during labor. *Id.* at 107. Figge and Physicians Insurance petitioned this court for review.

¶ 15. Before delving into our analysis we first sound a cautionary note. This opinion does not address controversial issues at each end of the medical spec-

trum. Namely, this opinion should not be interpreted as creating a patient's right to demand any treatment she desires. Further, this opinion should not be interpreted as requiring physicians to perform procedures they do not consider medically viable, procedures for which they lack the appropriate expertise, or procedures to which they are morally opposed. Rather, this case is decided on narrow and discrete issues: (1) Did Janice withdraw her consent; (2) if so, did that withdrawal together with the existence of viable medical options for treatment trigger Figge's duty under the informed consent statute to again discuss the benefits and risks of her medical options; and (3) if such a duty exists, should an objective or subjective test be applied to the question of whether Figge's failure to conduct another informed consent discussion caused the Schreibers' injuries?

¶ 16.  The issues present a mixed question of fact and law. We defer to the circuit court's findings of fact unless they are unsupported by the record and are therefore clearly erroneous. *Clarmar Realty Co., Inc. v. City of Milwaukee Redevelopment Authority*, 129 Wis. 2d 81, 94, 383 N.W.2d 890 (1986); Wis. Stat. § 805.17(2). However, the application of those facts to the pertinent law is a question of law which we review independently of the determinations rendered by the court of appeals and circuit court but benefiting from their analyses. *Miller v. Thomack*, 210 Wis. 2d 650, 658, 563 N.W.2d 891 (1997).

¶ 17.  The doctrine of informed consent traces its origins to the common law notion that an adult has a "right to determine what shall be done with his own body. . . ." *Schloendorff v. Society of New York Hospital*, 105 N.E. 92, 93 (N.Y. 1914), *overruled on other*

grounds, *Bing v. Thunig*, 143 N.E.2d 3 (N.Y. 1957). Originally founded on the common law tort of assault and battery, *see Paulsen v. Gundersen*, 218 Wis. 578, 584, 260 N.W. 448 (1935), the limitations of that theoretical framework became apparent with the passage of time. *Trogun v. Fruchtman*, 58 Wis. 2d 569, 598–99, 207 N.W.2d 297 (1973). Namely, a doctor's performance of an unauthorized treatment did not intuitively coincide with the "intentional, antisocial nature of battery" nor did it adequately reflect the fact that patients "consent" on some level whenever they see a doctor. *Martin v. Richards*, 192 Wis. 2d 156, 171, 531 N.W.2d 70 (1995). As a result, negligence—the doctor's failure to exercise reasonable care to a patient—replaced intentional battery as the theoretical underpinning for the doctrine. *Id.*

¶ 18.  Over twenty years ago this court gave shape to the doctrine as it currently exists in Wisconsin. *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 227 N.W.2d 647 (1975). In light of the fundamental purpose driving the doctrine, we concluded that a physician's duty to reveal the risks and benefits of available treatment options extended to the information a reasonable patient would need to know in order to make an informed decision. *Id.* at 12–13. We stressed that physicians were not required to disclose absolutely every fact or remote possibility that could theoretically accompany a procedure. Rather, the touchstone of the test was what the reasonable person in the position of the patient would want to know. *Id.* at 13.

¶ 19.  Within a few years after we decided *Scaria*, the legislature codified *Scaria*'s test as Wis. Stat.

§ 448.30.[3] The statute requires physicians to disclose information to patients about the viable medical modes of treatment so that when the patient chooses a method of treatment, that choice is made knowing both the reasonable risks and benefits of her decision.

¶ 20.　There is no question on appeal that prior to Janice's labor, Figge satisfied the requirements of the informed consent statute. That issue was contested at trial and was resolved in favor of Figge. The Schreibers do not challenge that finding on appeal. Were that the whole of the story, this case would not have come before this court. The Schreibers argue that after Janice's initial consent but before Kimberly's birth a substantial change of circumstances occurred that nullified the original consent and obligated Figge to again have an informed consent discussion with Janice. That substantial change of circumstances was Janice's

---

[3] **448.30 Information on alternate modes of treatment.** Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physician's duty to inform the patient under this section does not require disclosure of:

(1)　Information beyond what a reasonably well-qualified physician in a similar medical classification would know.

(2)　Detailed technical information that in all probability a patient would not understand.

(3)　Risks apparent or known to the patient.

(4)　Extremely remote possibilities that might falsely or detrimentally alarm the patient.

(5)　Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.

(6)　Information in cases where the patient is incapable of consenting.

withdrawal of her consent where another medically viable option existed.

¶ 21. There is little doubt that consent, once given, is not categorically immutable. *See Mack v. Mack*, 618 A.2d 744 (Md. 1993) ("a corollary to [informed consent] is the patient's right, in general, to refuse treatment and to withdraw consent to treatment once begun"). If we determine as a matter of fact that consent was withdrawn, we must also determine as a matter of law whether consent can be withdrawn at this particular stage of the procedure.

¶ 22. The circuit court concluded that Janice initially agreed to the VBAC and that once labor began she could not change her decision unless there was a substantial change in medical circumstances. It is undisputed that during her labor Janice told Figge on three separate occasions that she wanted to cease the VBAC and have a cesarean delivery. Moreover, Janice sent her husband to tell the nurse to relay the message to Figge yet another time. Though she never said the magic words, "I revoke" we conclude that her repeated statements are a clear indication of her withdrawal of consent. The circuit court thought likewise, concluding that if Figge had put the "choice to her squarely," she would have chosen the cesarean. Even Figge recognized that Janice no longer desired to continue with the VBAC. He testified that he would have done the cesarean section had Janice persisted.[4] We are unsure, after three unsuccessful personal attempts and a

---

[4] Figge's testimony on cross-examination was as follows:

Q. [A]s a hypothetical matter, if after [Figge discussed the matter with Janice,] Mrs. Schreiber had refused your recommendation, your recommendation being [to continue the VBAC], if there would have been a refusal to accept what you were recommending to the

fourth unsuccessful attempt through the nurse, how much more Janice could have done to convince Figge.

¶ 23.   Regardless of whether she factually withdrew her consent, the circuit court concluded that once a procedure has been initiated the time for a decision and discussions relating to that decision has passed. We reject the notion that the onset of a procedure categorically forecloses a patient's withdrawal of consent. To be sure, at some point in virtually every medical procedure a patient reaches a point from which there is no return. However, that point need not be arbitrarily created at the commencement of treatment. Rather it varies with the nature and circumstances of the individual procedure and continues so long as there exist alternative viable modes of medical treatment.

¶ 24.   In this case, a cesarean delivery at all times remained a viable medical alternative to the VBAC and ultimately that is how Figge delivered Kimberly. Unlike the circuit court, we determine that since alternative viable modes of medical treatment existed, Janice was still able to withdraw her consent to the VBAC.

¶ 25.   Having determined that Janice had withdrawn her consent to the VBAC, we must now examine the effect, if any, of that withdrawal. The Schreibers contend that her withdrawal both removed Figge's authority to continue with the VBAC and obligated him to conduct another informed consent discussion. We agree.

patient, Doctor, and a demand made at that point for repeat cesarean, what would you have done?

A.  Well, like I said, I would still have tried to encourage her to proceed, but, you know, if I wasn't able to convince her so that she would be comfortable proceeding and persisted, I think I would have to—probably have to go along with that request, but I have never had that situation.

¶ 26.   In considering Figge's authority to continue with the VBAC, we note well-settled law provides that a physician, absent exigent circumstances, may not perform a procedure on a competent adult without consent. *See, e.g., Lojuk v. Quandt*, 706 F.2d 1456, 1460 (7th Cir. 1983) (applying Illinois law); *see also In the Matter of Guardianship of L.W.*, 167 Wis. 2d 53, 68, 482 N.W.2d 60 (1992) ("The logical corollary of the doctrine of informed consent is the right not to consent—the right to refuse treatment."); *Paulsen*, 218 Wis. at 583–84. Figge would not assert that absent Janice's consent to the VBAC he would nonetheless be authorized to attempt the procedure. The function of withdrawal, in effect, places Janice and Figge in their original position—a physician, a patient, and a series of options for treatment. It creates a blank slate on which the parties must again diagram their plan.

¶ 27.   Since Figge no longer had consent to continue with the VBAC we are persuaded that Janice's withdrawal obligated Figge under the statute to again have an informed consent discussion with her. The circuit court reasoned that the physician's duty to again conduct an informed consent discussion occurred only if the medical circumstances were so changed as to alter the risks a patient faced from the time he or she first consented. Though not cited by the circuit court, this is essentially the position taken by the Colorado Supreme Court in *Gorab v. Zook*, 943 P.2d 423, 430–31 (Colo. 1997).

¶ 28.   In *Gorab*, the Colorado Supreme Court concluded that, under Colorado law, a physician has no general duty to continue to explain the treatment options and their corresponding risks once the physician obtains consent and begins the procedure. *Id.* at

430. However, the Colorado court noted that "where a new, previously undisclosed, and substantial risk arises, there may be an additional and independent duty to warn" the patient of that risk. *Id.* The *Gorab* court, much like the circuit court in this case, concluded that because any risks the patient faced during the procedure were risks previously disclosed, the physician was not under a duty to conduct another informed consent discussion.

¶ 29.   As a general principle, we find *Gorab*'s and the circuit court's rationale convincing. If a patient consents to a procedure knowing the risks, the physician has satisfied his or her duty under the informed consent statute. We conclude, however, the circuit court erred in its determination of what could constitute a substantial change of circumstances. The circuit court only considered medical changes of circumstances. We conclude that it needed to consider legal changes of circumstances as well. A withdrawal of consent during the course of treatment to the treatment agreed upon before treatment constitutes a substantial change in circumstances triggering a physician's duty under the informed consent statute to re-advise the patient of the available treatment options and their risks.

¶ 30.   Either a substantial medical or substantial legal change of circumstances results in an alteration of the universe of options a patient has and alters the agreed upon course of navigation through that universe. Where the change is medical, the alteration is a new risk or benefit previously unforeseen. Where the change is legal, the alteration is a withdrawal of an option previously foreseen. Though these cases travel from different directions, they arrive at the same destination: a new informed consent discussion. This

discussion, much like any other such discussion, would have entailed the risks and benefits at that time of the medically viable modes of treatment and again presented her an opportunity to choose her treatment.

¶ 31.  This conclusion does not alter the principles of informed consent. Rather it more fully articulates those principles by applying the doctrine in a factual context we have previously not faced. Our cases to date have only dealt with the initial adequacy of the informed consent discussion. *See, e.g., Johnson v. Kokemoor*, 199 Wis. 2d 615, 545 N.W.2d 495 (1996) (informed consent discussion before the procedure did not adequately inform the patient of morbidity rates and the physician's lack of experience in performing the procedure); *Martin*, 192 Wis. 2d at 167–69 (the informed consent discussion did not reveal the availability of a CT scanner and the unavailability of a neurosurgeon at the particular hospital); *Scaria*, 68 Wis. 2d at 3–9 (the informed consent discussion failed to inform patient that dye used for x-rays could cause paralysis or death); *Trogun*, 58 Wis. 2d at 592–604 (the informed consent discussion failed to explain potential side effects of drug for tuberculosis).

¶ 32.  This case, however, asks us to determine the continuing vitality of an informed consent discussion. We decline to view the informed consent discussion as a solitary and blanketing event, a point on a timeline after which such discussions are no longer needed because they are "covered" by some articulable occurrence in the past. Rather, a substantial change in circumstances, be it medical or legal, requires a new informed consent discussion. *See, e.g., Paulsen*, 218 Wis. at 583–84 (consent for "simple" mastoid operation not sufficient for "radical" version of the same operation). To conclude otherwise would allow a

solitary informed consent discussion to immunize a physician for any and all subsequent treatment of that patient.

■

¶ 33. Consistent with Wis. Stat. § 448.30 Figge had a duty to conduct another informed consent discussion and should have again presented Janice her treatment options and given her the opportunity to choose. His failure to do so was a violation of that duty.

¶ 34. As with any negligence action, a party must show the breach of a duty that caused an injury. Having determined that Figge breached his duty under the informed consent statute, we now turn to whether the circuit court erred in applying an objective test to the question of whether Figge's failure to again conduct an informed consent discussion was a cause of the Schreibers' injuries. *See Martin*, 192 Wis. 2d at 182.

¶ 35. Since at least *Scaria*, this court has agreed with the majority of American jurisdictions in employing what is known as the "objective test." *Scaria*, 68 Wis. 2d at 12–15. The objective test focuses on what the attitudes and actions of the reasonable person in the position of the patient would have been rather than on what the attitudes and actions of the particular patient of the litigation actually were. It asks two questions. First, did the physician fail to give information that a reasonable patient would want to know? *Kokemoor*, 199 Wis. 2d at 632. Second, given the additional information, would the reasonable patient have acted differently than they did without the information? *Martin*, 192 Wis. 2d at 182.

¶ 36. We adopted this objective test because it is more amenable to the adverse nature of litigation. Litigation rarely occurs in the absence of injury. With this in mind, we have concluded that the objective test is

more "workable and more fair" than asking the fact finder to determine the question of liability in large part on the credibility of a plaintiff whose testimony is tempered by the occasion of an undesirable event. *Scaria*, 68 Wis. 2d at 15; *Canterbury v. Spence*, 464 F.2d 772, 791 (D.C. Cir. 1972) ("[The subjective test] calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk.").

¶ 37.   We reaffirm our commitment to the objective test when faced with a traditional informed consent case. The rationale for the objective test set forth in *Scaria* has worn well in the decades that have passed since its announcement and remains a durable fabric for the future. In traditional informed consent cases, an injured patient alleges that the physician failed to reveal some pertinent information, and that the patient would not have consented to the course of treatment if the pertinent information was disclosed. *See, e.g., Kokemoor*, 199 Wis. 2d at 641–47 (physician failed to adequately explain morbidity rates and the physician's lack of experience performing the particular procedure); *Martin*, 192 Wis. 2d at 167–69 (the informed consent discussion did not reveal the availability of a CT scanner and the unavailability of a neurosurgeon at the particular hospital); *Scaria*, 68 Wis. 2d at 3–9 (physician failed to inform patient that dye used for x-rays could cause paralysis or death). Thus, our law has framed the cause question essentially as, "Would a reasonable patient have acted differently if the informed consent discussion had occurred?" *See Martin*, 192 Wis. 2d at 182.

¶ 38.   However, in this type of case the underlying rationale for the objective test, as noted above, is not implicated. The traditional informed consent case nec-

435

essarily requires a fact finder to do more than find facts; it requires the fact finder to be prophetic. The fact finder is not only asked to determine what actually did happen but is also asked to determine what would have happened if the informed consent discussion had occurred. The fact finder is asked to construct a puzzle with pieces missing and, where missing, to create them so that the puzzle is complete.

¶ 39.   Yet, in this case, the fact finder is asked only to determine what did occur and to put the existing pieces of the puzzle together. Janice does not contend that she did not have adequate information about her delivery options so that, if she had more information, she would have chosen the cesarean delivery. Her claim is based on Figge's failure to conduct an informed consent discussion which deprived her of the opportunity for her choice of treatment after she clearly expressed her withdrawal of consent for the VBAC.

¶ 40.   In this type of informed consent case where the issue is not whether she was given the pertinent information so that her choice was informed, but rather whether she was given an opportunity to make a choice after having all of the pertinent information, the cause question is transformed into, "What did the patient himself or herself want?" In these cases, the objective test is not needed and may lead to absurd results. It is not needed because the danger it alleviates—relying on an injured plaintiff's testimony to determine what would have occurred—does not exist because the fact finder is not asked to determine what would have occurred but only what did occur. It can lead to absurd results when the known and concrete choice of the actual person may well be ignored if it does not comport

to what the hypothetical reasonable person would have chosen.

¶ 41.  Having determined above that Janice did withdraw her consent and that her withdrawal triggered Figge's duty to have another informed consent discussion, by applying the subjective test we further conclude that had Janice been given the opportunity for a choice in treatment she would have chosen the cesarean delivery. Our conclusion is based not on speculation but on the record and factual findings of the circuit court. There can be no serious disagreement that Janice stated that she wanted the cesarean delivery. Figge's testimony indicates that he knew Janice wanted the cesarean delivery. Further, the circuit court found that she already had all of the necessary information and that "if the choice had been put to her squarely she would have opted for a [cesarean] section." Applying the objective test to a case such as this would result in the evisceration of Janice's actually expressed and understood choice of treatment in favor of what the hypothetical reasonable person would have chosen. When we actually know what was chosen based on the disclosure of all of the pertinent information, we need not engage in the hypothetical exercise of what the reasonable person would have chosen.

¶ 42.  In summary, we determine that Janice withdrew her consent to a vaginal delivery. Because alternative viable modes of medical treatment existed at that time, her withdrawal constituted a substantial change in circumstances obligating Figge under Wis. Stat. § 448.30 to conduct a new informed consent discussion and affording Janice the opportunity for a choice of treatment. Figge's failure to conduct such a discussion deprived Janice of the opportunity to pro-

ceed with her actual and clearly expressed choice, a cesarean delivery. In applying the subjective test to causation, we conclude that the plaintiffs' damages flowed from Figge's failure to conduct the informed consent discussion. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed and the cause remanded to the circuit court to determine damages.